## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

WALSH CONSTRUCTION COMPANY,

        Third-Party Plaintiff,

        v.

LB STEEL, LLC and CAL TESTING, INC. d/b/a
CALUMET TESTING SERVICES,

        Third-Party Defendants.

No. 2007 L 3886

Calendar T

### WALSH CONSTRUCTION COMPANY'S SECOND AMENDED THIRD-PARTY COMPLAINT AGAINST LB STEEL, LLC AND CAL TESTING, INC d/b/a CALUMET TESTING SERVICES

NOW COMES the Third-Party Plaintiff, Walsh Construction Company ("Walsh"), by and through its attorneys, O'Rourke, Hogan, Fowler, & Dwyer, LLC, and for its Second Amended Third-Party Complaint against Third-Party Defendants, LB Steel, LLC and Cal Testing, Inc. d/b/a Calumet Testing Services, states as follows:

### GENERAL ALLEGATIONS

1.    On April 13, 2007, the City of Chicago ("City") filed its fourteen count original Complaint against numerous defendants alleging breaches of contract, breaches of fiduciary duty, and contractual indemnity arising from the design and construction of a new canopy/curtain-wall system called the Façade and Circulation Enhancement Project at O'Hare International Airport in Chicago, Illinois ("FACE Project").

2.    On November 3, 2008, the City filed its twenty-two count Second Amended Complaint against the originally-named defendants and Walsh Construction Co. of Illinois ("Second Amended Complaint").

3.     On May 21, 2010, the City filed its twenty-six count Third Amended Complaint against the originally-named defendants and Walsh ("Third Amended Complaint"). A copy of the Third Amended Complaint without the voluminous exhibits is attached hereto as Exhibit 1.

4.     Third-Party Plaintiff Walsh is an Illinois corporation with an office at 929 West Adams Street, Chicago, Illinois and is in the business of providing general construction services, among other things.

5.     Third-Party Defendant LB Steel, LLC ("LB Steel") is a Delaware limited liability company conducting business in Illinois with an office located at 15700 S. Lathrop Avenue, Harvey, Illinois and is in the business of providing steel fabrication services.

6.     Third-Party Defendant Cal Testing, Inc. d/b/a Calumet Testing Services ("Cal Testing") is an Indiana corporation conducting business in Illinois with its registered agent's office located at 10121 Lancaster Drive, Mokena, Illinois and is in the business of providing testing services for steel and steel related activities.

## BACKGROUND

7.     In or around January 2003, the City and Walsh entered into a contract whereby Walsh would serve as the general contractor for the construction of Bid-Package One of the FACE Project, which consisted of the construction of the work at Terminal Two ("T-2") and Terminal Three ("T-3") ("Walsh Contract"). A copy of the Walsh Contract is attached as Exhibit 8 to the City's Third Amended Complaint and is incorporated in this pleading by reference.

8.     Walsh entered into a subcontract agreement with Carlo Steel Corporation ("Carlo") whereby Carlo agreed to fabricate and erect structural steel for the T-2 and T-3 canopies of the FACE Project ("Walsh-Carlo Subcontract"). A true and accurate copy of the Walsh-Carlo Subcontract is attached hereto as Exhibit 2.

9.      Carlo entered into a subcontract agreement with LB Steel whereby LB Steel agreed to fabricate, among other things, the structural steel for the T-2 and T-3 canopies for the FACE Project ("Carlo-LB Steel Subcontract").    A true and accurate copy of the Carlo-LB Steel Subcontract is attached hereto as Exhibit 3.

10.      The Carlo-LB Steel Subcontract provides, in relevant part: "To the extent terms of the agreement between Walsh Construction and Carlo Steel Corporation [prime agreement] apply to the work of Subcontractor, Carlo Steel Corporation assumes toward Subcontractor all obligations, rights, duties, and redress that Walsh Construction assumes toward Carlo Steel Corporation.  In an identical way Subcontractor assumes toward Carlo Steel all obligations, rights, duties, and redress that Carlo Steel assumes towards Walsh Construction and others under the prime agreement."

11.      In Paragraph 1 of the Carlo-LB Steel Subcontract, LB Steel agreed to "...provide fabrication and erection of all steel for the canopy structure, as per plans and specifications, including all necessary shop drawings, nuts, bolts, etc. as more fully described in Exhibit G." Exhibit G to the Carlo-LB Steel Subcontract is the "Walsh Construction/Carlo Steel Prime Agreement", which includes by reference the Walsh Contract.

12.      LB Steel entered into an oral subcontract agreement with Cal Testing whereby Cal Testing agreed to perform certain testing and review of the welding LB Steel performed for the FACE Project ("LB Steel-Cal Testing Subcontract").

13.      Walsh and Carlo entered into an agreement, as amended, whereby Carlo assigned to Walsh portions of its subcontracts, including portions of the Carlo-LB Steel Subcontract.  A true and accurate copy of the assignment, as amended, is attached hereto as Exhibit 4 ("Assignment").

14.      Walsh asserts its claims against LB Steel, in part, pursuant to the Assignment.

15.    In or around November of 2005, a crack was discovered in a weld in the installed Column 8B.7 at the FACE Project.

16.    As a result of the crack in Column 8B.7, the City issued a Quality Deficiency Report ("QDR") to Walsh.

17.    LB Steel installed the weld that cracked in Column 8B.7.

18.    As a result of the crack in Column 8B.7, the City directed Werner Sobek Ingeniuere ("WSI") to develop a plan to verify that the steel fabricated by LB Steel, including the welds, was in conformance with the FACE Project's Contract Documents ("WSI Plan").

19.    In early 2007, the City directed Walsh to implement the WSI Plan. The WSI Plan involved coring the erected steel in approximately forty-six (46) locations, each core approximately two (2) inches in diameter.

20.    In addition to Walsh, the City directed other companies to assist Walsh in performing the coring work.

21.    The City gave the cores to Bodycote Testing Group, Inc. ("Bodycote").

22.    On October 17, 2007, the City's representative for the FACE Project, Chicago Airports Resources Ent. ("CARE"), transmitted a test report dated October 15, 2007 to Murphy/Jahn, Inc. regarding the results of tests conducted by Bodycote. A true and accurate copy of the Bodycote report is attached hereto as Exhibit 5.

23.    Bodycote examined sample welds in coupons extracted from Columns 8D.3, 4P.3, and 4B.7. The sample coupons were submitted to Bodycote for weld examination and material testing.

24.    Bodycote's tests were conducted as outlined by WSI.

25.     In summary, Bodycote's opinion was that: (i) the partial and full penetration welds performed by LB Steel in plates extracted from columns 8D.3, 4P.3, and 4B.7 showed several locations of nonconformance to the requirements of AWS D1.1 Structural Welding Code; (ii) cracks in the root pass performed by LB Steel were found in the full penetration weld of column 4B.7 and in the partial penetration weld of column 8D.3; and (iii) inconsistent hardness of the welds performed by LB Steel most likely was caused by improper pre-heating and post heating of the weld joint.

26.     Bodycote reported that five of the six welds performed by LB Steel at randomly investigated column joints showed incorrect weld preparation, incorrect weld execution, and lacked proper quality control.

27.     Based on the findings of Bodycote, WSI authored three letters dated October 23, 24, and 25, 2007 which expressed very strong concerns over the safety and stability of the canopy structure.  True and accurate copies of the WSI letters are attached hereto as Exhibit 6.

28.     On October 26, 2007, the City notified Walsh that Bodycote discovered the deficient welds, as discussed above, and ordered Walsh to design shoring for the canopy and demanded that Walsh implement the shoring program immediately.  A true and accurate of the October 26, 2007 correspondence is attached hereto as Exhibit 7.

29.     Walsh immediately notified LB Steel of Bodycotes' findings with respect to the deficient welds.  A true and accurate copy of the notification is attached hereto as Exhibit 8.

30.     On October 29, 2007, WSI issued a Structural Safety of the Primary Canopy Structure O'Hare report ("Shoring Recommendation").  A true and accurate copy of the Shoring Recommendation is attached hereto as Exhibit 9.

31.     Walsh performed various engineering and construction services and engaged Wiss, Janney, and Elsner ("WJE") to assist in the design of the shoring for the canopy of the FACE Project.

32.     On November 9, 2007, the City issued a notice to cure to Walsh ("November 9, 2007 Notice to Cure"). A true and accurate copy of the November 9, 2007 Notice to Cure is attached hereto as Exhibit 10.

33.     In the November 9, 2007 Notice to Cure, the City demanded that Walsh investigate the alleged defective welds, test other welds, and remediate any deficiencies. The notice to cure the defaults was made pursuant to Article XVIII(C)(2) of the General Conditions of the Walsh Contract.

34.     Walsh, in turn, notified LB Steel (through e-mails, letters and phone conversations) regarding the quality of welds provided by LB Steel for the FACE Project. In one such letter dated December 7, 2007, Walsh demanded that LB Steel secure the services of a steel erector to perform remedial work. A true and accurate copy of the December 7, 2007 letter is attached hereto as Exhibit 11.

35.     WSI prepared a remedial design dated February 27, 2008 to repair defective welds provided by LB Steel at 31 column bases.

36.     On March 4, 2008, the City provided Walsh with the remedial design for weld repairs near the 31 column bases. A true and accurate copy of the remedial design is attached hereto as Exhibit 12.

37.     On March 5, 2008, the City directed Walsh to proceed with the remedial work associated with weld repair of 31 column bases. A true and accurate copy of the March 5, 2008 correspondence is attached hereto Exhibit 13.

38.     On March 5, 2008, Walsh notified LB Steel of the City's directive and repair procedure to remediate LB Steel's defective welds near the bases of the 31 columns for T-2 and T-3.

39.     Walsh provided LB Steel with a three (3) working day notice for LB Steel to correct the contractual quality deficiencies.  A true and accurate copy of Walsh's March 5, 2008 notice to cure letter is attached hereto as Exhibit 14.

40.     Article 12.1 of the Carlo-LB Steel Subcontract provides:

> FAILURE OF PERFORMANCE.   Should Subcontractor fail to satisfy contractual deficiencies or to commence and continue satisfactory correction of the default with diligence or promptness within three [3] working days from receipt of Carlo Steel's written notice, then Carlo Steel without prejudice to any right or remedies, shall have the right to take whatever steps it deems necessary to correct deficiencies and charge the cost thereof to Subcontractor, who shall be liable for such payment, including reasonable overhead, profit, and attorney's fees.

41.     Article 8.1 of the Walsh-Carlo Subcontract entitled "Failure of Performance", incorporated into the Carlo-LB Steel Subcontract, provides:

> If the Subcontractor refuses or fails to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work, or it fails to make prompt payment for its workers, subcontractors or suppliers, disregards Laws or orders of any public authority having jurisdiction, or otherwise is guilty of a material breach of a provision of this Agreement, and fails within seventy-two (72) hours after receipt of written notice (confirmed facsimile transmission shall constitute sufficient notice) to commence and continue satisfactory correction of such default with diligence and promptness, the Contractor, without prejudice to any rights or remedies, shall have the right to any or all of the following remedies: (i) supply such number of workers and quantity of materials, equipment and other facilities as the Contractor deems necessary for the completion of the Subcontractor's Work, or any part thereof which the Subcontractor has failed to complete or perform after the aforesaid notice, and charge the cost thereof to the Subcontractor, who shall be liable for the payment of same including reasonable overhead, profit and attorney's fees; (ii) contract with one or more additional contractors to perform such part of the Subcontractor's Work as the Contractor shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Subcontractor; and/or (iii) withhold payment of any moneys due the Subcontractor pending corrective action to the extent required by and to the satisfaction of the

Contractor and the Architect/Engineer. In the event of an emergency affecting the safety of persons or property, the Contractor may proceed as outlined above without notice.

42.     LB Steel was provided a three (3) working day notice, per Article 12.1 of the Carlo-LB Steel Subcontract and Article 8.1 of the Walsh-Carlo Subcontract, to satisfy contractual deficiencies or to commence and continue satisfactory correction of default.

43.     On March 10, 2008, LB Steel provided a written response to Walsh's March 5, 2008 notice to cure. A true and accurate copy of the March 10, 2008 letter is attached hereto as Exhibit 15.

44.     LB Steel did not cure the defective welds.

45.     On March 12, 2008, the City provided Walsh with final reports authored by Bodycote related to Bodycote's testing of the rotunda of the FACE Project, as well as ultrasonic testing reports authored by STS, a testing agency retained for the FACE Project. A true and accurate copy of the City's March 12, 2008 correspondence is attached hereto as Exhibit 16.

46.     STS authored a report dated March 10, 2008 regarding testing of hammerhead weld location HHS_2 in the canopy structure of the FACE Project.

47.     STS's report indicated that the welds provided by LB Steel were deficient. A true and accurate copy of the STS report is attached hereto as Exhibit 17.

48.     STS authored another report dated March 18, 2008 in connection with a plug extracted from the hammerhead weld location TJCT_3 T-Joint column top, second sample.

49.     STS's examination revealed LB Steel's welds contained entrapped slag, large fit-up gap between the plates, incomplete fusion, cracks at the root, indentations, and otherwise non-conformance with AWS D1.1-2004 Section 4.30.2.3 acceptance criteria. A true and accurate copy of the STS report is attached hereto as Exhibit 18.

50.     The Bodycote and STS reports show insufficient penetration of the full penetration welds and several significant weld imperfections due to poor preparation and execution of the welding.

51.     On March 27, 2008, LB Steel sent a letter to Walsh whereby it stated that it would not provide shoring for the canopy or weld repair. A true and accurate copy of the March 27, 2008 LB Steel letter is attached hereto as Exhibit 19.

52.     On March 31, 2008, the City submitted to Walsh WSI's recommendation for shoring the rotunda canopy of the FACE Project. A true and accurate of the City's submittal to Walsh is attached hereto as Exhibit 20.

53.     On March 31, 2008, Walsh submitted a notice to cure to LB Steel for the design and installation of shoring at the rotunda section of the canopy of the FACE Project. The notice to cure letter directed LB Steel to begin providing rotunda shoring by April 3, 2008. A true and accurate of the March 31, 2008 notice to cure is attached hereto as Exhibit 21.

54.     On April 2, 2008, LB Steel provided a response to Walsh's notice to cure letter and did not agree to perform as requested. A true and accurate of LB Steel's response is attached hereto as Exhibit 22.

55.     On April 9, 2008, Walsh again submitted a notice to cure to LB Steel whereby Walsh demanded that LB Steel provide shoring and repair the defective welds. A true and accurate of the April 9, 2008 notice to cure is attached hereto as Exhibit 23.

56.     On April 14, 2008, the City notified Walsh that there were weld deficiencies of the top skin canopy at T-2 and T-3 in the EX1 phases of the FACE Project. A true and accurate of the City's April 14, 2008 notice to Walsh is attached hereto as Exhibit 24.

57.     On April 22, 2008 and April 23, 2008, Walsh notified LB Steel that it was responsible for the costs of investigation of the top plate splices in the areas of 2EX1 and 3EX1 of the FACE Project, among other things.  True and accurate copies of the April 22, 2008 and April 23, 2008 notices are attached hereto as Exhibit 25.

58.     On April 28, 2008, the City submitted a letter to Walsh demanding that the weld remediation, as prepared by WSI, be initiated immediately.  A true and accurate of the City's April 28, 2008 letter is attached hereto as Exhibit 26.

59.     On May 14, 2008, Walsh provided another notice to cure to LB Steel to remediate the defective welds.  A true and accurate of Walsh's notice to cure is attached hereto as Exhibit 27.

60.     On May 14, 2008, Walsh provided LB Steel with a notice to cure P10/P11 welds, welds that LB Steel acknowledged needed to be repaired.  A true and accurate of Walsh's notice to cure is attached hereto as Exhibit 28.

61.     On May 19, 2008, Walsh provided LB Steel with a notice to respond to WSI's comments to LB Steel's consultants' report.  A true and accurate of Walsh's notice is attached hereto as Exhibit 29.

62.     On May 21, 2008, Walsh submitted a letter to LB Steel which stated that LB Steel failed to comply with the May 14, 2008 seventy-two [72] hour notice to cure and that Walsh would remediate LB Steel's defective welds.  A true and accurate of Walsh's May 21, 2008 letter is attached hereto as Exhibit 30.

63.     On or around May 23, 2008, LB Steel presented to Walsh a report prepared by Construction Technology Laboratories called the Fitness for Service Report related to the remediation of the defective welds (a copy of the report is an attachment to Exhibit 33).

64.     On May 29, 2008, Walsh submitted notice to LB Steel that additional testing of LB Steel's welds would be conducted by Bodycote. A true and accurate of Walsh's notice is attached hereto as Exhibit 31.

65.     On June 3, 2008, WSI approved the WJE Approach (defined below). A true and accurate copy of the June 10, 2008 e-mail with the June 3, 2008 approval of the WJE Approach is attached hereto as Exhibit 32.

66.     On June 4, 2008, Walsh provided a 72 hour notice to cure to LB Steel regarding the defective welds and provided the City's, through WSI, rejection of LB Steel's consultants' Fitness for Service Report. A true and accurate of Walsh's notice to cure, including the City's, through WSI, rejection of the Fitness for Service Report, is attached hereto as Exhibit 33.

67.     On June 9, 2008, LB Steel responded to Walsh's June 4, 2008 seventy-two [72] hour notice to cure letter that it was only willing to replace two welds. A true and accurate of LB Steel's response is attached hereto as Exhibit 34.

68.     On June 18, 2008, LB Steel responded to Walsh letters dated June 10, 2008 and June 17, 2008. LB Steel reiterated its position as set forth in the June 9, 2008 letter. A true and accurate of LB Steel's letter is attached hereto as Exhibit 35.

69.     LB Steel refused to comply with Walsh's demand that LB Steel investigate the allegations of defective welds; shore the rotunda; and to remediate any defective welds in breach of Article 12.1 of the Carlo-LB Steel Subcontract and Article 8.1 of the Walsh-Carlo Subcontract, incorporated into the Carlo-LB Steel Subcontract.

70.     In addition to Article 12.1 of the Carlo-LB Steel Subcontract and Article 8.1 of the Walsh-Carlo Subcontract, Article XVIII(B) of the Walsh Contract, incorporated into the Carlo-LB

Steel Subcontract, titled "Events of Default" states that "The Contractor's failure to perform any of its obligations under the Contract, including, but not limited to the following, are events of default:"

71.   Article XVIII(B)(3) provides that "Failure to perform in accordance with the Contract Documents" is an event of default.

72.   Article XVIII(B)(4) provides that "Failure to remove materials, repair, or promptly replace Work that was rejected as defective or unsuitable" is an event of default.

73.   Article XVIII(B)(5) provides that "Unauthorized discontinuance of the Work" is an event of default.

74.   Article XVIII(B)(8) provides that "Failure to carry on the Work in a manner acceptable to the Commissioner" is an event of default.

75.   Article XVIII(B)(10) provides that "Failure to comply with any other term of this Contract that states an event of default" is an event of default.

76.   Article XVIII(B)(11) provides that "Failure to comply with any term of this Contract in any material respect" is an event of default.

77.   As a result of LB Steel's refusal and failure to investigate and remediate the defective welds, Walsh asked its consulting expert, WJE, to investigate the allegations of defective welds.

78.   Walsh, WJE, and the City conducted a comprehensive investigation into the size and quality of the welds LB Steel provided for the FACE Project.

79.   Walsh, WJE, and the City discovered that the welds provided by LB Steel in numerous locations were not in compliance with the approved shop drawings in terms of the size and quality of the welds.

80.     Additionally, Walsh, WJE, and the City discovered that many of the welds provided by LB Steel contained slag, cracks and other unacceptable flaws that did not conform to the standards as set forth in the Contract Documents.

81.     The City initially demanded that Walsh remove and replace all of the welds that were discovered not to be in compliance with the Contract Documents.

82.     The potential cost to remove and replace all of the welds discovered not to be in compliance with the Contract Documents would have run in the tens of millions of dollars.

83.     Walsh asked its consulting expert, WJE, to prepare a structural engineering report and design to present to the City whereby the scope of remediation would not entail removing and replacing all of the defective welds, but would assure a safe canopy ("WJE Approach").

84.     Walsh presented the WJE Approach to the City for its approval.

85.     In the Fall of 2008, WSI authored a refinement of the WJE Approach which is known as the Ten Point Program and indicated that it would not require all of the welds to be removed and replaced.  A true and accurate copy of the Ten Point Program is attached hereto as Exhibit 36.

86.     In order to conduct the investigation of the welds necessary for the WJE Approach, Walsh incurred substantial expense in retaining WJE and others, as well as substantial cost for Walsh's own services.

87.     Walsh also incurred substantial expense in retaining WJE to prepare the WJE Approach, as well as substantial cost for Walsh's own services with respect to weld remediation.

88.     Remediation work was performed, at great expense to Walsh, on the areas of the FACE Project where the welds were required to be removed, replaced, or reinforced.

89.     Walsh demanded that LB Steel provide the labor, equipment, management, and material necessary to remediate these welds.

90.     LB Steel refused to provide the field labor, equipment, management, and most of the material necessary to remediate these welds.

91.     In or around January 2013, Walsh and the City entered into a settlement agreement whereby Walsh agreed to pay to the City Ten Million Dollars ($10,000,000.00) out of the contract balance being held by the City ("Walsh-City Settlement").

92.     Walsh entered into the Walsh-City Settlement because of the likelihood that the City would be successful in recovering its damages from Walsh caused by the structural steel work performed by LB Steel on the canopy structure of the FACE Project.

93.     By entering into the Walsh-City Settlement, Walsh mitigated its damages caused by LB Steel.

94.     Walsh also has incurred over $25,000,000.00 to investigate LB Steel's defective welds and to design and implement a repair procedure to remediate LB Steels' defective welds.

95.     Walsh mitigated its damages by convincing the City to accept the WJE Approach, which saved tens of millions of dollars.

## COUNT I
### Second Amended Third-Party Complaint Against LB Steel
### Breach of Contract

96.     Walsh incorporates the allegations contained in Paragraphs 1-95 above as its allegations for Paragraph 96 of Count I.

97.     The City alleged in its Third Amended Complaint damages arising from, among other things, defective welds by Walsh and its subcontractors, namely, LB Steel.

14

98.     In addition to Paragraph 1 of the Carlo-LB Steel Subcontract, Paragraph 5 of the Carlo-LB Steel Subcontract incorporated by reference and made as part of the Carlo-LB Steel Subcontract the "Prime Agreement, Drawings, Specifications, General, Special, Supplementary, and other conditions and addenda" as well as the "Walsh Construction/Carlo Steel Prime Agreement" ("Relevant Contract Documents").

99.     The Walsh Contract, incorporated into the Carlo-LB Steel Subcontract, provides in Part Two, General Conditions Article VI:

A.      Standards of Performance:

1.      The Contractor must perform, or cause to be performed, all of the Work required by the Contract with that degree of skill, care, and diligence normally exercised by experienced contractors performing that type of work in projects of a scope and magnitude comparable to the Project. The Contractor must use its best efforts to assure timely and satisfactory completion of the Work. The Contractor must at all times act in the best interests of the City. The Contractor must perform, or cause to be performed, all Work in accordance with the terms and conditions of this Contract and to the reasonable satisfaction of the Commissioner.

B.      Compliance with Contract Documents:

The Contractor must supervise and direct the Work competently and efficiently, devoting such attention thereto and applying such skills and expertise as may be necessary to perform the Work in accordance with the Contract Documents. The Contractor will be responsible to see that the Work complies with the Contract Documents.

100.    Part Two, General Conditions Article VI of the Walsh Contract, entitled Quality of Workmanship, Equipment and Materials, also provides:

C.      Correction of Work:

4.      Neither the final certificate of project completion, nor payment, nor any provision in the Contract Documents will relieve the Contractor of responsibility for nonconforming Work, faulty materials, equipment or workmanship and, unless otherwise specified, the Contractor will remedy

any defects thereto and pay for any damage to other Work resulting therefrom. The Commissioner will give written notice of such observed defects with reasonable promptness."

E.    Materials:

    1.    Quality of Materials

        a.    Unless otherwise specified in the Contract Documents, all material incorporated into the Project must be new and must be incorporated in such a manner as to produce completed construction, which is in conformance with the Contract Documents and acceptable in every detail to the Commissioner. The Contractor must certify on the 'Request For Inspection of Material' form designated by the Commissioner that all materials and equipment to be used on the project comply with all Contract requirements. Only materials which conform to the requirements of the Contract Documents shall be incorporated in the Work.

        b.    In the absence of a definite specification, materials must be the best of their respective kinds with properties best suited to the Work required. Inspection of materials shall be as specified in Article XIII, 'Testing and Inspection.'

101.    The Walsh Contract, incorporated into the Carlo-LB Steel Subcontract, required that all welding be performed in accordance with industry welding standards set forth by the American Welding Society ("AWS") as referred from the AISC Specifications.

102.    The City, in its Third Amended Complaint, alleged that many of the welds installed by Walsh, or by subcontractors retained by Walsh for whom Walsh is responsible, namely, LB Steel, contained unacceptable amounts of slag, cracks and other unacceptable AWS flaws, and therefore did not meet the required minimum industry welding standards and the requirements of the Walsh Contract.

103.    The City, in its Third Amended Complaint, alleged that many of the welds joining steel pieces together to form the support structure of the canopy system did not meet industry standards and the requirements of the Walsh Contract.

16

104. The City, in its Third Amended Complaint, alleged that as a result of Walsh's, or Walsh's subcontractors, namely, LB Steel, failure to weld steel to meet the required minimum industry welding standards, AWS standards, and the Walsh Contract requirements, the welding of the canopy required repairs and increased monitoring and maintenance.

105. Per the Carlo-LB Steel Subcontract, LB Steel was required to follow the Relevant Contract Documents, including, but not limited to the Walsh Contract and the Walsh-Carlo Subcontract.

106. Per the Carlo-LB Steel Subcontract, LB Steel was responsible for the fabrication, including welding, of the structural steel used on the FACE Project.

107. LB Steel breached the Carlo-LB Steel Subcontract by providing defective welds, as alleged by the City, and welds that included cracks, slag, and other flaws and otherwise failed to meet the requirements of the approved shop drawings and Relevant Contract Documents.

108. Walsh mitigated its damages to the City caused by LB Steel by entering into the Walsh-City Settlement in which Walsh paid Ten Million Dollars ($10,000,000.00) to the City for the City's damages caused by LB Steel.

109. As a result of LB Steel's defective welds on the FACE Project, Walsh is entitled to recover Ten Million Dollars ($10,000,000.00) from LB Steel, the amount that Walsh had to pay to the City, because of LB Steel's defective work.

110. LB Steel is required to: (i) defend and indemnify Walsh pursuant to the Carlo-LB Steel Subcontract as third-party beneficiary; (ii) defend and indemnify Walsh as assignee of the Carlo-LB Steel Subcontract; and (iii) defend and indemnify Walsh pursuant to the Walsh-Carlo Subcontract.

111. Paragraph 1 of the Carlo-LB Steel Subcontract provides, in relevant part:

In an identical way Subcontractor assumes toward Carlo Steel all obligations, rights, duties, and redress that Carlo Steel assumes towards Walsh Construction and others under the prime agreement.

112.   Paragraph 11 of the Carlo-LB Steel Subcontract, entitled "Indemnity", provides:

To the fullest extent permitted by law, Subcontractor shall defend, indemnify, and hold harmless Carlo Steel, Carlo Steel's other subcontractors, Architect/Engineer, **Walsh Construction** __and their agents, consultants, employees and others as required by this Agreement from all claims for bodily injury and property damage that may arise from performance of Subcontract Work to the extent of the negligence attributable to such acts or omissions by Subcontractor, Subcontractor's subcontractors or anyone employed directly or indirectly by any of them or by anyone whose acts any of them may be liable. *(emphasis added)*.

113.   Article 9.3 of the Walsh-Carlo Subcontract, incorporated into the Carlo-LB Steel Subcontract, entitled "Additional Indemnification", provides, in relevant part:

Subcontractor shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all claims, demands, suits, actions, expenses, judgments, losses and liabilities, including fines and penalties, costs and attorneys', consultants', and experts' fees as a result of Subcontractor's actual or alleged failure to perform this Subcontract in accordance with the terms of this Agreement and the Contract Documents. The foregoing obligations of Subcontractor shall include, but are not limited to, indemnifying, defending and holding harmless from claims made by third parties against any Indemnified Party. Subcontractor's liability includes, but is not limited to, (i) damages and other delay costs payable by Contractor; (ii) Contractor's increased costs of performance, such as extended overhead and increased performance costs resulting from Subcontractor caused delays or omitted or defective Subcontractor's Work; (iii) warranty, rework and repair costs; (iv) liability to third parties, including, but not limited to, other subcontractors of Contractor and Owners' contractors; (v) excess reprocurement costs; (vi) consultants and experts' fees; and (viii) attorneys' fees and related costs. Subcontractor's actual or alleged failure to perform shall include the actual or alleged failure of Subcontractor's lower-tier subcontractors or suppliers to perform. ***

114.   The City alleged that the matters contained in Count XI of the City's Third Amended Complaint constitute losses and costs to the City caused by Walsh and/or its agents,

employees or persons employed or engaged by Walsh to perform the Services, namely, LB Steel, to be provided under the Walsh Contract.

115.   The City alleged that it is entitled to recover these costs and expenses in their entirety from Walsh.

116.   LB Steel is required to defend, indemnify, and hold harmless Walsh pursuant to the indemnity language contained in the Carlo-LB Steel Subcontract and the indemnity language contained in the Walsh-Carlo Subcontract.

117.   First, Walsh is entitled to contractual indemnity from LB Steel as a third-party beneficiary to the Carlo-LB Steel Subcontract.

118.   Second, Walsh is entitled to contractual indemnity from LB Steel as an assignee of the Carlo-LB Steel Subcontract.

119.   Third, Walsh is entitled to contractual indemnity from LB Steel pursuant to Article 9.3 of the Walsh-Carlo Subcontract, incorporated into the Carlo-LB Steel Subcontract.

120.   The Ten Million Dollars ($10,000,000.00) that Walsh paid to the City constitute losses and costs to Walsh caused by LB Steel.

121.   Additionally, LB Steel breached the Walsh Contract, the Walsh-Carlo Subcontract, and the Carlo-LB Steel Subcontract by providing defective welds for the FACE Project.

122.   Each individual error and omission alleged above constitutes a single and separate breach of the Walsh Contract, the Walsh-Carlo Subcontract, and the Carlo-LB Subcontract.

123.   As a result of LB Steel's breach, Walsh is entitled to recover damages which include, but are not limited to: (i) all of its costs to correct approximately 50 to 75 quality deficiencies as detailed in reports generated by the City detailing work alleged by the City to be deficient ("QDR"); (ii) all of its costs to correct approximately 50 to 100 non-conformance reports,

reports generated by Walsh's inspectors which details LB Steel's non-conforming work ("NCR"); (iii) all of its costs related to the impacts to other Walsh subcontractors' work, paid by Walsh, and caused by LB Steel; (iv) all of its costs related to impacts to Walsh's work, not paid by the City, and caused by LB Steel; (v) all of its costs to investigate and remediate the canopy per the investigations conducted by WJE known as the WJE Approach (later defined); and (vi) the Ten Million Dollars ($10,000,000.00) that Walsh paid to the City because of LB Steel's defective work.

124.    Walsh has performed all the obligations on its part.

125.    In addition to the Ten Million Dollars ($10,000,000.00) that Walsh paid to the City, Walsh's damages include costs associated with investigation, removal, repair and/or replacement, additional costs of construction, additional costs for overhead, profit, supervision and management of the investigation and remedial work, and costs for consultants and attorneys.

126.    Walsh's damages, in addition to the Ten Million Dollars paid by Walsh to the City, are more than Twenty Five Million Dollars ($25,000,000.00).

WHEREFORE, Walsh Construction Company requests that judgment be entered in its favor and against LB Steel, LLC in an amount to be determined at trial in excess of $35,000,000.00, plus attorneys' fees and costs, plus any other relief that this Court deems relevant.

## COUNT II
### Second Amended Third-Party Complaint Against Cal Testing
### Professional Negligence

127.    Walsh hereby incorporates its allegations contained in Paragraphs 1-126 of Count I of the Second Amended Third-Party Complaint as its allegations for Paragraph 127 of this Count II against Cal Testing.

128.    The investigation into the steel fabrication provided by LB Steel for the FACE Project revealed that many of the welds did not conform to the Relevant Contract Documents and the approved shop drawings.

129.    Cal Testing was retained by LB Steel to provide testing and inspection of the work performed by LB Steel to insure compliance of that work with the Relevant Contract Documents.

130.    LB Steel's quality control department directed the scope of Cal Testing's work.

131.    Cal Testing provided an insufficient number of inspectors to properly inspect LB Steel's work and otherwise failed to properly inspect LB Steel's work.

132.    LB Steel directed Cal Testing to the specific location and amount of welds to test.

133.    As a result, Cal Testing failed to test all of the welds fabricated by LB Steel.

134.    Cal Testing had a duty to furnish to Walsh information regarding or relating to the quality of welds LB Steel provided for the FACE Project.

135.    Cal Testing authored, prepared and submitted to Walsh inspection and test reports related to the steel fabricated by LB Steel ("Cal Testing Inspection and Testing Reports").

136.    By furnishing the Cal Testing Inspection and Testing Reports to Walsh, Cal Testing represented that it had inspected the welds performed by LB Steel and that the welds were performed in conformance with the Relevant Contract Documents and the approved shop drawings.

137.    Cal Testing had a duty to accurately represent the information contained in the Cal Testing Inspection and Testing Reports, including the quality of the welds provided by LB Steel and to ensure the welds were in conformance with the Relevant Contract Documents and the approved shop drawings.

138.    When Cal Testing furnished the Cal Testing Inspection and Testing Reports to Walsh, Cal Testing knew or reasonably should have known that Walsh would rely upon the Cal

Testing Inspection and Testing Reports and would rely on the representations by Cal Testing that the LB Steel work was complete, accurate, and in conformance with the Relevant Contract Documents and approved shop drawings for the FACE Project.

139.    Walsh was entitled to rely, and did rely, upon the accuracy of the Cal Testing Inspection and Testing Reports, including the representations that the welds were in conformance with the Relevant Contract Documents and approved shop drawings.

140.    The Cal Testing Inspection and Testing Reports provided to Walsh were for the guidance of Walsh in its business dealings including the performance of Walsh's contractual obligations to the City.

141.    Cal Testing did not perform any construction work on the FACE Project.

142.    The Cal Testing Inspection and Testing Reports were provided to Walsh solely to substantiate that LB Steel was in compliance with the Relevant Contract Documents and approved shop drawings for the FACE Project.

143.    Cal Testing is liable to Walsh for one or more of the following acts or omissions of Cal Testing:

a.      negligently misrepresenting that the welds performed by LB Steel were in compliance with the Relevant Contract Documents and approved shop drawings; and

b.      negligently misrepresenting that the welds performed by LB Steel met applicable welding standards.

144.    Walsh is entitled to recover from Cal Testing the Ten Million Dollars ($10,000,000.00) it paid to the City, plus its damages for the inspection, testing, shoring,

remediation, and other related damages as a direct and proximate result of the aforementioned negligent misrepresentations of Cal Testing.

145.    Walsh's damages related to the costs associated with investigation, removal, repair and/or replacement, additional costs of construction, additional costs for overhead, profit, supervision and management of the investigation and remedial work, and costs for consultants and attorneys related to the defective welds are more than Twenty Five Million Dollars ($25,000,000.00), which are the direct and proximate result of the aforementioned negligent misrepresentations of Cal Testing.

WHEREFORE, Walsh Construction Company prays that this Honorable Court enter judgment in its favor and against Cal Testing, Inc. d/b/a Calumet Testing Services in an amount to be determined at trial in excess of $35,000,000.00, plus costs, and any other relief that this Court deems relevant.

**COUNT III**
**Second Amended Third-Party Complaint Against LB Steel**
**Professional Negligence**

146.    Walsh hereby incorporates its allegations contained in Paragraphs 1-126 of Count I of the Second Amended Third-Party Complaint as its allegations for Paragraph 146 of this Count III against LB Steel.

147.    LB Steel, as a professional steel fabricator, was under a duty to use the same degree of knowledge, skill and ability as an ordinary, careful, professional steel fabricator would exercise under similar circumstances.

148.    LB Steel breached its professional duty by providing many defective welds as set forth in Count I of this Second Amended Third-Party Complaint.

149.     LB Steel's professional negligence proximately caused Walsh's damages, as detailed in Count I of this Second Amended Third-Party Complaint.

150.     Walsh is entitled to recover against LB Steel for all damages proximately caused by LB Steel's professional negligence, including, but not limited to, the Ten Million Dollars ($10,000,000.00) Walsh paid to the City pursuant to the Walsh-City Settlement and its damages for the inspection, testing, shoring, remediation, and other related damages which are in excess of Twenty Five Million Dollars ($25,000,000.00) as a direct and proximate result of the aforementioned professional negligence of LB Steel.

WHEREFORE, Walsh Construction Company prays that this Honorable Court enter judgment in its favor and against LB Steel, LLC in an amount to be determined at trial in excess of $35,000,000.00, plus costs, and any other relief that this Court deems relevant.

## Count IV
### Second Amended Third-Party Complaint Against LB Steel
### Fraud

151.     Walsh hereby incorporates its allegations contained in Paragraphs 1-126 of Count I of the Second Amended Third-Party Complaint as its allegations for Paragraph 151 of this Count IV against LB Steel.

152.     During the City and Walsh's investigation into the defective work provided by LB Steel, it was discovered that LB Steel did not properly perform Weld #1, P10/P11, near the base of all columns at the FACE Project.

153.     LB Steel represented that it properly performed Weld #1, P10/P11, near the base of all columns at the FACE Project, by, among other things, submitting a Quality Control Binder ("QC Binder") that stated: (i) that the welds were fabricated in accordance with the requirements of

the Relevant Contract Documents; (ii) that the welds had been tested as required by the Relevant Contract Documents; and (iii) that there was "No Non-Conformance."

154.    LB Steel delivered the QC Binder with knowledge that the information contained therein was false and with the knowledge that Walsh would rely on that information.

155.    The statements made by LB Steel in the QC Binder for the welds at the base of all columns are statements of material fact.

156.    LB Steel submitted the QC Binder for welds at the base of all columns with the intent to induce Walsh to act, namely to induce Walsh to incorporate the welds at the base of all columns into the FACE Project, to erect the structural steel, and to pay money.

157.    Walsh justifiably relied upon the truth of LB Steel's fraudulent representations in the QC Binder for the welds at the base of all columns.

158.    Subsequent to LB Steel making representations that it properly performed Weld #1, P10/P11, near the base of all columns at the FACE Project and the steel being erected at the FACE Project, Mike Goich, President of LB Steel, stated in a meeting held on October 30, 2007 that LB Steel considered the plates near the base of all columns at the FACE Project as cover plates and not structurally significant to the FACE Project.

159.    Additionally, Mike Goich admitted during the October 30, 2007 meeting that LB Steel knew that the welds at these locations were not performed properly.

160.    In another instance of fraud, during the implementation of the WJE Approach, it was determined that there were gouges on the inside of the A200 Box Beam that had been installed on the FACE Project, that some of the steel in the A200 Box Beam was made from steel plate that was 7/8" rather than 1" thick as required by the Relevant Contract Documents.

161.    LB Steel fabricated the A200 Box Beam for the FACE Project and knew that there were gouges on the inside of the Box Beam assembly, knew that some of the plate steel was 7/8" rather than 1" thick, knew that there were some missing and mis-located stiffners, and knew that routine inspections conducted by others would not reveal these deficiencies.

162.    LB Steel represented that the A200 Box Beam was fabricated in accordance with the Relevant Contract Documents, by, among other things, submitting a QC Binder for the A200 Box Beam and that the Box Beam assembly had been tested as required by the Relevant Contract Documents and that there was "No Non-Conformance." A copy of the QC Binder submitted by LB Steel in connection the A200 Box Beam is attached hereto as Exhibit 37.

163.    Despite having knowledge of the gouges in the A200 Box Beam, the 7/8" plate steel, and that, as a result, the Box Beam assembly, as fabricated and delivered to the FACE Project, did not meet the requirements of the Relevant Contract Documents, LB Steel represented that the A200 Box Beam was fabricated in accordance with the Relevant Contract Documents.

164.    LB Steel represented that the A200 Box Beam was fabricated in accordance with the Relevant Contract Documents by, among other things, delivering the QC Binder, with knowledge that the information was false and with the knowledge that Walsh would rely on that information.

165.    The statements made by LB Steel related to Box Beam A200 are statements of material fact.

166.    LB Steel's statements, including, but not limited to the submission of the QC Binder for Box Beam A200, were made with the intent to induce Walsh to act, namely to induce Walsh to incorporate the Box Beam A200, including the welds, for erection into the FACE Project and to pay money.

167.    Walsh justifiably relied upon the truth of LB Steel's fraudulent representation in the QC Binder for Box Beam A200.

168.    During the course of the City's and Walsh's investigation into the defective welds provided by LB Steel for the Project, the City and Walsh discovered that LB Steel installed a 7/8" plate in the A200 Box Beam assembly where a 1" thick plate was specified.

169.    The plans and specification of the Walsh Contract required that 1" thick plate be utilized in the A200 Box Beam assembly.

170.    LB Steel, as fabricator of the structural steel, knew that a 1" thick plate was required, yet knowingly utilized a 7/8" plate at locations which were hidden from view once LB Steel completed the Box Beam Assembly.

171.    Despite having knowledge that 1" plate was required, LB Steel delivered the steel to the Project with knowledge that plate GP7 installed in the A200 Box Beam assembly was 7/8" thick and made false statements that the A200 Box Beam assembly was in accordance with the Relevant Contract Documents.

172.    The statements, including, but not limited to the statements in the QC Binder for the A200 Box Beam assembly, were statements of material fact.

173.    LB Steel made the false statements, including, but not limited to the submission of the QC Binder, for the A200 Box Beam assembly with the intent to induce Walsh to act, namely to induce Walsh to incorporate the A200 Box Beam assembly and welds for erection into the FACE Project and to pay money.

174.    Walsh justifiably relied upon the truth of LB Steel's fraudulent representations regarding the A200 Box Beam assembly.

175.     In another instance of fraud, during the course of the City's and Walsh's investigation into the defective welds provided by LB Steel for the Project, the City and Walsh discovered that LB Steel did not properly install weld 6.2 on the inside of the box girder on top of the columns

176.     LB Steel, as fabricator of the structural steel, knew that it did not properly install weld 6.2 on the inside of the box girder on top of the columns because it was impossible to properly perform the weld pursuant to LB Steel's welding procedure.  In order to perform the weld pursuant to LB Steel's welding procedure, a welder would need to reach 3' into a 10" wide opening, which is impossible.

177.     This improper weld using LB Steel's welding procedure was repeated as many as 70 times on other non-visible, internal welds throughout the FACE Project.

178.     Despite having knowledge that it did not properly install weld 6.2 on the inside of the box girder on top of the columns, LB Steel delivered the steel for numerous columns with weld 6.2 to the Project and made false statements that weld 6.2 was performed in accordance with the Relevant Contract Documents by, among other things, submitting QC Binders for the column assemblies which indicated that the welding had been performed in accordance with all contractual requirements and that there was no non-conformance.

179.     The false statements and QC Binders are statements of material fact.

180.     LB Steel made the false statements, including, but not limited to submitting the QC Binders, with the intent to induce Walsh to act, namely to induce Walsh to accept the columns and the welds for erection at the FACE Project and to pay to money.

181.     Walsh justifiably relied upon the truth of LB Steel's fraudulent statements for the columns.

182.     In another instance of fraud, during the course of the City's and Walsh's investigation into the defective welds provided by LB Steel for the Project, the City and Walsh discovered that LB Steel did not properly align the stiffeners inside the column hammerhead at Column 8R7 and at other locations.

183.     LB Steel, as fabricator of the structural steel, knew that it did not properly align the stiffeners inside the column hammerhead on Column 8R7, and at other locations, because LB Steel added bar steel to the top of the stiffeners as backer for the flange welds to hide their defective work.

184.     This improper alignment occurred in several locations in the column hammerhead at Column 8R7 and at other locations which LB Steel knew would not be discovered during the normal course of construction or inspection.

185.     Despite having knowledge that it did not properly align the internal stiffeners for the column hammerhead inside Column 8R7 and other locations, LB Steel delivered the steel for Column 8R7, and other locations, to the Project and made false statements that the steel welds were performed in accordance with the Relevant Contract Documents by, among other things, submitting a QC Binder for the Column 8R7 assembly which indicated that the welding had been performed in accordance with all contractual requirements and that there was no non-conformance. A copy of the Column 8R7 QC Binder is attached as Exhibit 38.

186.     The false statements and QC Binders are statements of material fact.

187.     LB Steel made false statements and submitted the 8R7 QC Binder with the intent to induce Walsh to act, namely to induce Walsh to accept Column 8R7 and the welds for erection at the FACE Project and to pay to money.

188.     Walsh justifiably relied upon the truth of LB Steel's fraudulent statements.

189. Many of the QC Binders were critiqued by Walsh, TOK, and CARE because of missing or inconsistent information.

190. LB Steel made certain changes to the QC Binders after the critiques.

191. At the time LB Steel submitted its QC Binders and subsequent changes to the QC information, Walsh did not have reason to believe that the information was false.

192. After the City and Walsh completed their investigations into the issues related to the quality of LB Steel's welds, it became apparent that LB Steel submitted fraudulent information contained in its QC material, including, for example, the information contained in the QC Binder for the A200 Box Beam assembly and the Column 8R7 assembly.

193. LB Steel, as fabricator of the structural steel, knew that it submitted fraudulent information in its QC Binders and information.

194. The false statements and QC Binders and information are statements of material fact.

195. LB Steel made the false statements and submitted the QC Binders and information with the intent to induce Walsh to act, namely to induce Walsh to accept its work, erect the steel for the FACE Project, and to pay money.

196. Walsh justifiably relied upon the truth of LB Steel's false statements and fraudulent QC Binders and information.

197. In another instance of fraud, during the course of the City's and Walsh's investigation into the defective welds provided by LB Steel for the Project, the City and Walsh discovered that LB Steel did not properly install weld 4 at Column 8B.7.

198. LB Steel, as fabricator of the structural steel, knew that it did not properly install weld 4 at Column 8B.7 because the weld was under-filled with weld material and the under-filled weld was covered with Bondo in LB Steel's shop, rather than the specified weld material.

199. This improper technique of LB Steel using Bondo to cover up and hide the under-filled weld was repeated at numerous other locations throughout the Project.

200. Despite having knowledge that it did not properly perform weld 4 on Column 8B.7 and elsewhere, LB Steel delivered the steel for Column 8B.7 to the Project and made false statements that the Column 8B.7 assembly was fabricated in accordance with the Relevant Contract Document, by, among other things, submitting a QC Binder for the Column 8B.7 assembly which indicated that the welding had been performed in accordance with all contractual requirements and that there was no non-conformance.

201. The false statements and QC Binders are statements of material fact.

202. LB Steel made the false statements and submitted the Column 8B.7 QC Binder with the intent to induce Walsh to act, namely to induce Walsh to accept and erect Column 8B.7 and pay money. A copy of the QC Binder for Column 8B.7 is attached as Exhibit 39.

203. Walsh justifiably relied upon the truth of LB Steel's fraudulent statements, including the Column 8B.7 QC Binder.

204. Each individual instance of fraud, alleged above, constitutes a single and separate action for fraud against LB Steel.

205. The investigation is on-going and may reveal other acts of fraud.

206. Walsh has been damaged as a result of LB Steel's fraud in the following ways: (i) Walsh and Carlo paid money to LB Steel; (ii) Walsh paid Ten Million Dollars ($10,000,000.00) to the City as a result of the City's damages caused by LB Steel; and (iii) Walsh has incurred

substantial expenses, in excess of Twenty Five Million Dollars ($25,000,000.00), in remediating LB Steel's fraudulent work.

WHEREFORE, Walsh Construction Company requests that judgment be entered in its favor and against LB Steel, LLC in an amount to be determined at trial in excess of $35,000,000.00, plus costs, and any other relief that this Court deems relevant.

## COUNT V
### Second Amended Third-Party Complaint Against Cal Testing
### Breach of Contract-Third-Party Beneficiary

207.   Walsh hereby incorporates its allegations contained in Paragraphs 1-145 of Count II of the Second Amended Third-Party Complaint as its allegations for Paragraph 207 of this Count V against Cal Testing.

208.   Walsh was an intended third-party beneficiary of the oral contract between LB Steel and Cal Testing.

209.   The contract between LB Steel and Cal Testing was undertaken for Walsh's benefit as general contractor of the FACE Project.

210.   The parties' intention, that Walsh be a third-party beneficiary, is evidenced by Cal Testing's submittal of the Cal Testing Inspection and Testing Reports to Walsh.

211.   By furnishing the Cal Testing Inspection and Testing Reports to Walsh, Cal Testing intended to benefit Walsh.

212.   Cal Testing represented to Walsh that it had inspected LB Steel's welds.

213.   Cal Testing represented to Walsh that LB Steel's welds were in conformance with the Relevant Contract Documents and the approved shop drawings.

214.   Cal Testing breached the contract by failing to accurately represent the information contained in the Cal Testing Inspection and Testing Reports, including that the quality of the welds

provided by LB Steel were in conformance with the Relevant Contract Documents and the approved shop drawings.

215. Walsh mitigated its damages to the City caused by Cal Testing's breach of contract by paying Ten Million Dollars ($10,000,000.00) to the City.

216. Walsh's damages also include costs associated with investigation, removal, repair and/or replacement, additional costs of construction, additional costs for overhead, profit, supervision and management of the investigation and remedial work, and costs for consultants and attorneys, which are in excess of Twenty Five Million Dollars ($25,000,000.00).

WHEREFORE, Walsh Construction Company requests that judgment be entered in its favor and against Cal Testing, Inc. d/b/a Calumet Testing Services in an amount to be determined at trial in excess of $35,000,000.00, plus costs, and any other relief that this Court deems relevant.

Dated: March 12, 2013

Respectfully submitted,

Walsh Construction Company

By: _Patrick J. Enright_
One of its Attorneys

John C. O'Rourke, Jr.
Patrick J. Enright
Joseph O. Enright
O'Rourke, Hogan, Fowler, & Dwyer
10 South LaSalle Street, Suite 2900
Chicago, Illinois 60603
(312) 739-3500
Firm Id: 39291

## VERIFICATION BY CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned Peter Glimco, certifies that he is General Counsel for Walsh Construction Company, certifies that he has read Walsh Construction Company's Second Amended Third-Party Complaint against LB Steel, LLC and Cal Testing, Inc. d/b/a Calumet Testing Services and that the allegations set forth therein are true and correct, except as to matters therein stated on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Peter T. Glimco, General Counsel
Walsh Construction Company

SUBSCRIBED and SWORN
To before me this 12th day of
March, 2012.

NOTARY PUBLIC

"OFFICIAL SEAL"
JULIA K. ARRIAGA
Notary Public, State of Illinois
My Commission Expires 06/28/2014