**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ST. PAUL GUARDIAN INSURANCE COMPANY, THE CHARTER OAK FIRE INSURANCE COMPANY, and TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, <br><br> Plaintiffs, <br><br> v. <br><br> WALSH CONSTRUCTION COMPANY, <br><br> Defendant. | Case No. 1:15-cv-10324 <br><br> Hon. Charles R. Norgle, Sr. |

## FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs, ST. PAUL GUARDIAN INSURANCE COMPANY ("St. Paul"), THE CHARTER OAK FIRE INSURANCE COMPANY ("Charter Oak"), and TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA ("Travelers") (St. Paul, Charter Oak, and Travelers are referred to collectively herein as "Plaintiffs"), by and through their attorneys, Karbal, Cohen, Economou, Silk & Dunne, LLC, hereby file their First Amended Complaint for Declaratory Judgment against Defendant, WALSH CONSTRUCTION COMPANY ("Walsh"), and allege as follows:

### NATURE OF THE ACTION

1.     In this action, Plaintiffs seek a declaration from this Court, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, that there is no coverage under primary and excess liability insurance policies issued by Plaintiffs to LB Steel, LLC ("LB Steel") with respect to: 1) approximately $24,132,650.00 arising from a judgment, entered in favor of Defendant Walsh and against LB Steel; or 2) for Walsh as an additional insured.

**THE PARTIES**

2.      Plaintiff St. Paul is a Connecticut corporation with its principal place of business located in Connecticut.

3.      Plaintiff Charter Oak is a Connecticut corporation with its principal place of business located in Connecticut.

4.      Plaintiff Travelers is a Connecticut corporation with its principal place of business located in Connecticut.

5.      Defendant Walsh is an Illinois corporation with its principal place of business located in Illinois, and was f/k/a Walsh Construction Company of Illinois.

**JURISDICTION AND VENUE**

6.      Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332(a), because the Plaintiffs and the Defendant are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b)(1), because Defendant Walsh is an Illinois corporation and resides in this judicial district.  In addition, venue is proper in this District, pursuant to 28 U.S.C. § 1391(b)(2), because Plaintiffs' claim arises out of the policies of insurance delivered in this District to LB Steel, the named insured under the policies.

8.      The Court has personal jurisdiction over Defendant Walsh under Federal Rule of Civil Procedure 4(k) and Illinois' long-arm statute, 735 ILCS 5/2-209(b)(3) & (b)(4), because Walsh is incorporated under the laws of the State of Illinois and is a corporation doing business in the State of Illinois.

1410901v6

## THE UNDERLYING LITIGATION

9.    On or about April 13, 2007, the City of Chicago ("City") filed suit in the Circuit Court of Cook County, Illinois, captioned *City of Chicago v. Murphy/Jahn, Inc. Architects, et al.*, No. 2007 L 003886, against numerous defendants alleging breaches of contract and breaches of fiduciary duty, and seeking contractual indemnity arising from the defective design and construction of a new canopy/curtain-wall system called the Façade and Circulation Enhancement Project ("FACE Project") at O'Hare International Airport in Chicago, Illinois ("Underlying Litigation").

10.    On or about November 3, 2008, the City field a Second Amended Complaint in the Underlying Litigation which joined Walsh as a defendant.  (A copy of the Second Amended Complaint, without exhibits, is attached hereto and incorporated herein at Exhibit 1.)

11.    On or about May 21, 2010, the City filed a Third Amended Complaint against the originally named defendants and Walsh in the Underlying Litigation ("Third Amended Complaint").  (A copy of the Third Amended Complaint, without exhibits, is attached hereto and incorporated herein at Exhibit 2.)

12.    The Third Amended Complaint alleges that the City entered into a contract with Walsh on or about January 31, 2003, in which Walsh was to serve as the General Contractor for the FACE Project.

13.    Count XI of the City's Third Amended Complaint alleges Breach of Contract against Walsh.

14.    Count XI of the City's Third Amended Complaint alleges that Walsh breached its contract in the following ways:

1410901v6

206. Walsh breached its contractual obligations by failing to conduct an adequate examination of the site and the Drawings or provide field verification of elevations and other project dimensions.

207. Walsh breached its contractual obligations by submitting an inadequate design for the canopy top-plate welds, which, *inter alia,* failed to take into consideration thermal load forces on the FACE Canopy structure.

208. Walsh breached its contractual obligations by performing, or causing to be performed, inadequate welds devoid of the degree of skill, care, and diligence normally exercised by experienced welders performing the type of welds that were called for in the specifications.

209 Defendant Walsh breached its contractual obligations by providing welds containing slag and other irregularities that do not meet AWS. In addition, Walsh provided welds that did not meet the lengths as shown on the approved shop drawings.

210. Defendant Walsh breached its contractual obligations by providing some steel that did not meet ASTM A572 Grade 50 quality as required by the Walsh Contract.

211. Walsh breached its contractual obligations by providing some sheet steel that did not meet ASTM A 366 quality as required by the Walsh Contract.

212. Walsh breached its contractual obligations by providing some steel plates for the top of the canopy that are pieces of steel welded together instead of providing a complete and new steel sheet in and of itself as required by the Walsh Contract.

213. Walsh breached its contractual obligations by failing to properly determine and verify all materials, field measurements, field conditions and verified quantities, including, but not limited to, by:

    (a) failing to adequately determine and verify the proper size and type of canopy top plate welds;

    (b) failing to identify that structural welds did not meet applicable welding standards;

    (c) failing to accurately determine thermal loads used in weld calculations, as required by the contract specifications;

    (d) failing to adequately calculate the structural capabilities of the FACE Project, including its thermal expansion capabilities;

    (e) failing to verify its elevation calculations against the updated survey control system which it previously had received; and

    (f) failing to determine that the steel it used in the FACE Project was inadequate and not in accord with the contract specifications or industry standards.

214.   Walsh further breached its contractual obligations by prematurely terminating moist curing for the concrete when constructing the sidewalks that front terminals two and three at the upper level roadway.

15.   Count XII of the City's Third Amended Complaint alleges Contractual Indemnity against Walsh pursuant to the indemnification provision in the contract between the City and Walsh.

16.   Count XIII of the City's Third Amended Complaint alleges False Claims against Walsh.

17.   The City alleges that "Walsh either knew that the mill certifications submitted by it, or subcontractors retained by it for whom it was responsible, were incorrect, or Walsh acted in deliberate ignorance or reckless disregard with respect to the truth or falsity of those mill certifications."

18.   The City alleges that based on the false mill certification, "Walsh submitted a false claim for payment to the City for work alleged to have been performed in accordance with its contractual obligations . . ." and that Walsh violated Section 1-22-020 of the Municipal Code of Chicago.

19.   On or about June 3, 2009, Defendant Walsh filed a Third-Party Complaint in the Underlying Litigation, and, on or about March 12, 2013, Defendant Walsh filed a Second Amended Third-Party Complaint ("SATPC") which named LB Steel as a third-party defendant. (A copy of the SATPC, without exhibits, marked as Exhibit A, is attached to the initial Complaint filed in the instant action on November 13, 2015 at Dkt. #1-1, and is incorporated herein by this reference.)

5

20. Walsh's SATPC filed in the Underlying Litigation alleges, in summary:

A. That, during or about January 2003, the City and Walsh entered into a contract whereby Walsh would serve as the general contractor for the construction of Bid-Package One of the FACE Project which consisted of construction work at Terminals Two and Three ("Walsh Contract").

B. That Walsh entered into a subcontract with Carlo Steel Corporation ("Carlo") whereby Carlo agreed to fabricate and erect structural steel for the canopies of Terminals Two and Three of the FACE Project ("Walsh-Carlo Subcontract").

C. That Carlo entered into a subcontract agreement with LB Steel whereby LB Steel agreed to "… provide fabrication and erection of all steel of the canopy structure [for Terminals Two and Three of the FACE Project], as per plans and specifications, including all necessary shop drawings, nuts, bolts, etc., as more fully described in [other contract documents]" ("Carlo-LB Steel Subcontract").

D. That Walsh and Carlo entered into an agreement, as amended, whereby Carlo assigned to Walsh portions of the Carlo-LB Steel Subcontract ("Assignment").

E. That LB Steel's steel fabrication and/or construction work and/or welds on the FACE Project suffered from cracks, defects, and/or contractual quality deficiencies including entrapped slag, large fit-up gap between the plates, incomplete fusion, cracks at the root, indentations, insufficient penetration of the full penetration welds, and unacceptable flaws, caused by improper

6

pre-heating and post-heating of the weld joints, incorrect weld preparation, incorrect weld execution, and improper quality control.

F.     That, during or about November 2007, the City issued a notice to Walsh to investigate the alleged defective welds, test other welds and remediate and cure any deficiencies and/or defaults.

G.     That Walsh notified LB Steel regarding the cracks, defects, and/or contractual quality deficiencies in the welds provided by LB Steel for the FACE Project.

H.     That the City directed Walsh to proceed with the repair of LB Steel's welds.

I.     That Walsh notified LB Steel of the City's directives and repair procedures to correct the defective welds and/or the contractual quality deficiencies, and provide shoring, but LB Steel stated it would not provide shoring for the canopy or weld repair, and LB Steel did not cure and/or correct its defective welds and/or contractual quality deficiencies or provide shoring.

J.     That under these circumstances the Walsh-Carlo Subcontract and the Carlo-LB Steel Subcontract authorized Walsh to investigate, cure and correct LB Steel's defects and/or contractual quality deficiencies and that Walsh proceeded to do so.

K.     That Walsh incurred over twenty-five million dollars ($25,000,000.00) to investigate LB Steel's defective welds and to design and implement a repair procedure to remediate LB Steel's defective welds.

7

21.     Count I of Walsh's SATPC filed in the Underlying Litigation alleges a claim for Breach of Contract against LB Steel for its breach of the FACE Project contracts, alleging that the City, in its Third Amended Complaint, alleged that many of LB Steel's welds were defective and contained unacceptable amounts of slag, cracks, and other unacceptable American Welding Society ("AWS") flaws and therefore did not meet the required minimum industry welding standards and requirements of the Walsh Contract.

22.     Count I of Walsh's SATPC filed in the Underlying Litigation also alleges that many of the welds joining steel pieces together to form the support structure of the canopy system were defective and did not meet industry standards and the requirements of the Walsh Contract, and that LB Steel breached the Carlo-LB Steel Subcontract by "providing defective welds, as alleged by the City, and welds that included cracks, slag, and other flaws and otherwise failed to meet the requirements of the approved shop drawings and Relevant Contract Documents."

23.     Count III of Walsh's SATPC[1] filed in the Underlying Litigation alleges a claim for Professional Negligence against LB Steel and alleges that "LB Steel breached its professional duty by providing many defective welds . . ."

24.     Count IV of Walsh's SATPC filed in the Underlying Litigation alleges a claim for Fraud against LB Steel and alleges that LB Steel made false statements and representations regarding the quality and fitness of its product/work on the FACE Project with the intent of inducing Walsh to accept LB Steel's work, erect the steel for the FACE Project and pay money.

25.     On or about October 14, 2015, judgment was entered in the Underlying Litigation "in favor of Walsh Construction Company ("Walsh") and against LB Steel, LLC ("LB Steel") on Count I of Walsh's Second Amended Third-Party Complaint in Case No. 2007 L 3886 against

---

[1] Count II of the SATPC is not directed to LB Steel.

1410901v6

LB Steel for Breach of Contract in the amount of $27,500,000.00", and judgment was "entered in favor of LB Steel and against Walsh on Count IV of Walsh's Second Amended Third-Party Complaint against LB Steel for fraud" ("Judgment"). (A copy of the Judgment Order, marked as Exhibit B, is attached to the initial Complaint filed in the instant action on November 13, 2015 at Dkt. #1-2, and is incorporated herein by this reference.)

26.     Also in the Judgment, the Court in the Underlying Litigation ordered credits and set-offs as against Walsh's judgment under Count I of Walsh's SATPC such that there was a "… net judgment in favor of Walsh Construction Company and against LB Steel, LLC in the amount of $19,187,304.00, less accrued interest from funds deposited by Calumet Testing" ("Judgment"). (*See* Judgment at ¶ 11 [Dkt. #1-2].)

## GENERAL ALLEGATIONS

27.     On or about October 19, 2015, LB Steel filed its Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq.

28.     LB Steel also appealed the Judgment.

29.     On September 28, 2018, the Illinois Appellate Court entered an opinion which affirmed in part, reversed in part, entered a revised judgment ("Amended Judgment"), and remanded the matter to the Circuit Court of Cook County for further proceedings. *See LB Steel, LLC v. Carlo Steel Corp.*, 2018 IL App (1st) 153501, 2018 Ill. App. LEXIS 712.

30.     On October 19, 2018, Walsh filed a Petition for Rehearing pursuant to Illinois Supreme Court Rule 367 seeking a rehearing with respect to a portion of the Illinois Appellate Court's opinion. Another party to the Judgment, Carlo, joined in Walsh's Petition for Rehearing.

1410901v6

31. In December of 2018, LB Steel, Walsh, Carlo, and others reached a global settlement which will resolve all claims between the parties in connection with the Judgment ("Settlement").

32 As a result of the Settlement, on December 20, 2018, Walsh moved to withdraw its Petition for Rehearing before the Illinois Appellate Court, which the Illinois Appellate Court granted on January 16, 2019.

33. The Illinois Appellate Court's mandate regarding its ruling on the Judgment was entered as of January 16, 2019.

34. Pursuant to the Settlement, Walsh sought to modify the automatic stay with the Bankruptcy Court in order to defend this action and file a counterclaim against LB Steel's insurers.

35. On March 7, 2019, the Bankruptcy Court granted Walsh's motion to modify the stay.

36. St. Paul then filed its motion to remove this case from the Court's stay calendar in order to file the instant Amended Complaint and proceed with this litigation [Dkt. #52], which was granted on March 21, 2019 [Dkt. #55].

**THE POLICIES[2]**

37. St. Paul issued the following insurance policies to LB Steel, which contain both primary and excess coverage parts:

| Policy No. | Policy Period |
|---|---|
| CK01205439 | 12/28/2002 – 12/28/2003 |
| CK01206228 | 12/28/2003 – 12/28/2004 |
| CK01206228 | 12/28/2004 – 12/28/2005 |
| CK01206228 | 12/28/2005 – 01/01/2006 |

---

[2] Plaintiffs have provided certified copies of the insurance policies referenced herein to Walsh and will also provide copies of all of the policies to the Court upon request.

38.     Collectively, the four insurance policies referenced in Paragraph No. 37 are referred to hereinafter as the "St. Paul Policies."  (A copy of the 12/28/2004-2005 St. Paul Policy, marked as Exhibit C, is attached to the initial Complaint filed in the instant action on November 13, 2015 at Dkt. #1-3, and is incorporated herein by this reference.)

39.     Travelers issued the following primary insurance policies to LB Steel:

| Policy No. | Policy Period |
| --- | --- |
| Y-630-9578B155-TIL-06 | 01/01/2006 – 01/01/2007 |
| Y-630-9578B155-TIL-07 | 01/01/2007 – 01/01/2008 |
| Y-630-9578B155-TIL-08 | 01/01/2008 – 01/01/2009 |

40.     Collectively, the three insurance policies referenced in Paragraph No. 30 are referred to hereinafter as the "Travelers Primary Policies."  The relevant terms, conditions, limitations, definitions and exclusions of the Travelers Primary Policies are the same or substantially similar.  (A copy of the 01/01/2006-2007 Travelers Primary Policy is attached hereto and incorporated herein at Exhibit 3.)

41.     Travelers issued the following excess insurance policies to LB Steel:

| Policy No. | Policy Period |
| --- | --- |
| YSM-CUP-9578B155-TIL-06 | 01/01/2006 – 01/01/2007 |
| YSM-CUP-9578B155-TIL-07 | 01/01/2007 – 01/01/2008 |
| YSM-CUP-9578B155-TIL-08 | 01/01/2008 – 01/01/2009 |
| YSM-CUP-9578B155-TIL-09 | 01/01/2009 – 01/01/2010 |
| YSM-CUP-9578B155-TIL-10 | 01/01/2010 – 01/01/2011 |

42.     Collectively, the five insurance policies referenced in Paragraph No. 41 are referred to hereinafter as the "Travelers Excess Policies."  The relevant terms, conditions, limitations, definitions and exclusions of the Travelers Excess Policies are the same or substantially similar.  (A copy of the 01/01/2006-2007 Travelers Excess Policy is attached hereto and incorporated herein at Exhibit 4.)

11

43.     The Travelers Primary Policies and the Travelers Excess Policies are referred to collectively herein as the "Travelers Policies."

44.     Charter Oak issued the following primary insurance policies to LB Steel:

| Policy No. | Policy Period |
| --- | --- |
| Y-630-9578B155-COF-09 | 01/01/2009 – 01/01/2010 |
| Y-630-9578B155-COF-10 | 01/01/2010 – 01/01/2011 |

45.     Collectively, the two insurance policies referenced in Paragraph No. 44 are referred to hereinafter as the "Charter Oak Primary Policies."  The relevant terms, conditions, limitations, definitions and exclusions of the Charter Oak Primary Policies are the same or substantially similar.  (A copy of the 01/01/2009-2010 Charter Oak Primary Policy is attached hereto and incorporated herein at Exhibit 5.)

46.     The St. Paul Policies, the Travelers Policies, and the Charter Oak Primary Policies are referred to collectively herein as the "Policies."  The Policies are subject to their respective terms, conditions, limitations, definitions and exclusions.

47.     The St. Paul Policies (CGL Primary Coverage), the Travelers Primary Policies, and the Charter Oak Primary Policies include primary commercial general liability ("CGL") coverage with limits of $1 million each event or each occurrence, $2 million products and completed work total limit and/or products-completed operations aggregate limit, and $2 million general total limit or general aggregate limit ("CGL Primary Coverage").

48.     The St. Paul Policies (Excess Coverage) and the Travelers Excess Policies include excess coverage with limits of $5 million each event or any one occurrence, $5 million products and completed work total limit or products/completed operations aggregate limit, and $5 million general total limit or general aggregate limit ("Excess Coverage").

1410901v6

**The St. Paul Policies (CGL Primary Coverage)**

49.     The St. Paul Policies' CGL Primary Coverage provides as to the insuring agreements and definition of property damage, event, personal injury, and injury or damage as follows:

> **What This Agreement Covers**
>
> **Bodily injury and property damage liability.**
>
> We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that:
>
> - happens while this agreement is in effect; and
> - is caused by an event. ...
>
> *Property damage means:*
>
> - physical damage to tangible property of others, including all resulting loss of use of that property; or
> - loss of use of tangible property of others that isn't physically damaged. ...
>
> We'll consider all physical damage to tangible property of others that's a continuation, change, or resumption of previously known physical damage to tangible property of others to happen before this agreement begins if such continuation, change, or resumption would otherwise be covered by this agreement because of a continuous, multiple, or other coverage trigger required under the law that applies.
>
> Of course, if there's a continuation, change, or resumption, after this agreement ends, of physical damage to tangible property of other that:
>
> - isn't previously known physical damage to tangible property of others; and
> - happens while this agreement is in effect;
>
> we'll consider such continuation, change, or resumption to also happen while this agreement is in effect if that would be the result because of a continuous, multiple or other coverage trigger required under the law that applies. ...
>
> *Previously known physical damage to tangible property of others* means physical damage to tangible property of others that happened before this agreement begins and was known by you or any described individual protected person before this agreement begins as a result of any of the following at that time:
>
> - You or any described individual protected person reporting all or part of that property damage to us or any other insurer.

13

- You or any described individual protected person receiving a claim or suit for all or part of that property damage.
- Any described individual protected person witnessing, or being told of, the beginning, or any change, continuation, or resumption, of all or part of that property damage.

*Event* means an accident, including continuous or repeated exposure to substantially the same general harmful conditions. …

*Personal injury* means injury, other than bodily injury or advertising injury, that's caused by a personal injury offense. …

*Injury or damage* means:

- bodily injury, personal injury, or advertising injury; or
- property damage.

*   *   *

The words you, your and yours mean the insured named here, which is a corporation, LB Steel, LLC…

50. The St. Paul Policies' CGL Primary Coverage provides the following relevant exclusions:

### Exclusions—What This Agreement Won't Cover …

**Contract liability.** We won't cover injury or damage for which the protected person has assumed liability under any contract or agreement.

But we won't apply this exclusion to injury or damage for which the protected person would have liability without the contract or agreement.

Nor will we apply this exclusion to the liability of another to pay damages for:

- bodily injury or property damage sustained by others if you have assumed such liability under a covered contract made before the bodily injury or property damage happens; …

*Covered contract* means: …

- that part of any other contract or agreement under which you assume the tort liability of another to pay damages for injury or damage.

*   *   *

**Damage to your products or completed work.**

We won't cover property damage to any of your products that's caused by your products themselves or by any of their parts. For example:

*You manufacture air conditioners. They contain several moving parts that can break down for many reasons. Regardless of the cause, we won't*

14

*protect you for any property damage to the part that fails or to the rest of the air conditioner.*

Nor will we cover property damage to your completed work that's caused by your completed work itself or by any of its parts. But we won't apply this exclusion part to such property damage if:

- this agreement provides completed work liability coverage; and
- your completed work that causes the property damage, was done for you by others.

For example:

*You construct a building as a general contractor. Some of the work is done by you while the rest is done for you by subcontractors. The building is accepted by the owner. If it's damaged by a fire caused by electrical wiring installed by a subcontractor, we won't apply the exclusion. However, if the wiring was installed by you, we'll apply the exclusion to property damage to your completed work done by you.*

We explain the terms your products and your completed work in the Products and completed work total limit section. …

\* \* \*

**Expected or intended bodily injury or property damage.** We won't cover bodily injury or property damage that's expected or intended by the protected person. ...

**Impaired property.** We won't cover property damage to impaired property, or to property that isn't physically damaged, that results from:

- your products that are faulty or dangerous;
- your completed work that is faulty or dangerous; or
- a delay or failure in fulfilling the terms of a contract or agreement.

But we won't apply this exclusion to the loss of use of property, other than your products or your completed work, that results from sudden and accidental physical damage to:

- your products after they've been put to their intended use; or
- your completed work after it has been put to its intended use.

For example:

*You supply an electric motor to a customer who uses it to power his conveyor. The motor's shaft breaks several days later while he's operating the conveyor. The conveyor isn't damaged, but your customer has extra costs because he's unable to use it until the motor is repaired. If he sues you to recover those costs, we won't apply the exclusion. However, if the customer discovers while hooking the motor up to the conveyor that the motor's shaft is broken, we won't protect you.*

15

*Impaired property* means tangible property, other than your products or your completed work, that can be restored to use by nothing more than:

- an adjustment, repair, replacement, or removal of your products, or your completed work, that forms a part of such tangible property; or
- your fulfilling the terms of a contract or agreement. …

51.     The St. Paul Policies' CGL Primary Coverage provides as to the terms your

products, your completed work, and your work as follows:

*Your products* means any of the goods or products that are or were manufactured, sold, handled, distributed, or disposed of by:

- you;
- others using your name; or
- any person or organization whose business or assets you've acquired.

Your products includes:

- all containers, equipment, materials, or parts provided with or for your products;
- any warranty provided with or for your products;
- any statement made, or that should have been made, about the durability, fitness, handling, maintenance, operation, performance, quality, safety, or use of your products; and
- all warnings, instructions, or directions provided, or that should have been provided, with or for your products.

But we won't consider the following to be your products:

- Goods or products that are still in your physical possession or on a premises that you rent, lease, or borrow from others, or own.
- Real property.
- Containers that are vehicles provided with or for your products.
- Property that's rented or leased to others.
- Property that you haven't sold, but which you allow others to use. For example, a vending machine.

*Your completed work* means your work that:

- is completed, including work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete; or
- has been abandoned by you.

16

We'll consider your work to be completed at the earliest of the following times:

- When all of the work called for in your contract has been completed.
- When all of the work to be done at the work site has been completed, if your contract calls for work at more than one site.
- When that part of the work at the work site has been put to its intended use by any person or organization, other than another contractor or subcontractor working on the same project.

Your completed work includes:

- any warranty provided with or for your completed work;
- any statement made, or that should have been made, about the durability, fitness, handling, maintenance, operation, performance, quality, safety, or use of your completed work; and
- all warnings, instructions, or directions provided, or that should have been provided, with or for your completed work.

But we won't consider the following to be your completed work:

- Uninstalled equipment, abandoned or unused materials or parts, or tools.
- Work done in connection with transporting property.
- Any premises or other real property that you own.
- Any work done to a premises or other real property that you rent or lease from others, or own.
- Any work while on a premises that you rent, lease, or borrow from others, or own.

*Your work* means any:

- work that you're performing or others are performing for you; or
- service that you're providing or others are providing for you.

Your work includes:

- all equipment, materials, parts, or tools being provided or used with or for your work;
- any statement being made, or that should have been made, about the durability, fitness, handling, maintenance, operation, performance, quality, safety, or use of your work; and
- all warnings, instructions, or directions being provided, or that should have been provided, with or for your work ....

**The St. Paul Policies (Excess Coverage)**

52. The St. Paul Policies' Excess Coverage contains the following insuring agreement:

**What this Agreement Covers**

**What We'll Pay**

**Bodily injury and property damage liability.**

We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that:

- happens while this agreement is in effect; and
- is caused by an event.

*   *   *

**Coverage When Your Basic Insurance Applies**

**Coverage above Basic Insurance limits other than total limits.** We'll pay damages that:

- are covered by this agreement;
- are covered by your Basic Insurance; and
- exceed your Basic Insurer's payment of the limits of coverage in your Basic Insurance, other than your total limits.

But we'll pay covered damages only up to the limits of coverage that apply under this agreement ....

*   *   *

**Coverage above reduced or exhausted Basic Insurance total limits.** We'll pay damages above reduced total limits in your Basic Insurance. But only if they've been reduced solely by your Basic Insurer's payment of:

- damages that would be covered by this agreement; or
- medical expenses that result from bodily injury caused by an event that happens while this agreement is in effect.

If any of your Basic Insurance total limits are used up because your Basic Insurer paid the damages or medical expenses described above, this agreement will then replace your basic Insurance for damages covered by this agreement.

However, if any of your Basic Insurance total limits are reduced or used up because your Basic Insurer paid:

- damages that wouldn't be covered by this agreement; or
- medical expenses that result from bodily injury . . .

we'll continue to apply this agreement only to damages that:

- are covered by this agreement; and
- exceed your Basic Insurance limits of coverage shown in the Schedule of Basic Insurance.

*   *   *

18

**Coverage When Your Basic Insurance Doesn't Apply**

We'll pay amounts any protected person is legally required to pay as damages for injury or damage that:

- is covered by this agreement; and
- is not covered by your Basic Insurance.

However, we'll pay only those amounts that are excess of the deductible shown in the Coverage Summary or the amounts payable by other insurance, whichever is greater. We'll then pay the remaining damages up to the limit of coverage that applies under this agreement.

*Injury or damage* means bodily injury, personal injury, advertising injury, or property damage.

*Other insurance* means valid and collectible insurance that:

- isn't your Basic Insurance; and
- isn't specifically purchased to be excess of this agreement.

Other insurance includes alternative risk transfer, risk management, or financing methods or programs, such as risk retention groups or self-insurance methods or programs.

53.    The St. Paul Policies' Excess Coverage contains the following relevant conditions:

**Other Insurance**

If there is any other insurance for injury or damage covered by this agreement, we won't make any payments until the other insurance has been used up with the payment of damages or medical expenses.

This insurance isn't subject to the terms or conditions of any other insurance.

\*    \*    \*

**Maintaining Your Basic Insurance**

You agree to maintain your Basic Insurance while this agreement is in effect. This means that:

- your Basic Insurance remains in effect;
- the terms and conditions of your Basic Insurance are not materially changed;
- your Basic Insurance limits of coverage aren't changed; and
- coverage that renews or replaces your Basic Insurance isn't more restrictive than the coverage being renewed or replaced. . . .

1410901v6

54.     The St. Paul Policies' Excess Coverage contains substantially the same exclusions as in the St. Paul Policies' CGL Coverage as well as other applicable terms, conditions and limitations.

**The Charter Oak Primary Policies and The Travelers Primary Policies**

55.     The Charter Oak Primary Policies and the Travelers Primary Policies provide as to the insuring agreements and definition of property damage, occurrence, and personal injury, as follows:

SECTION I — COVERAGES
COVERAGE A BODILY INJURY AND PROPERTY
DAMAGE LIABILITY

1.      Insuring Agreement

    a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        (1) The amount we will pay for damages is limited as described in Section III — Limits Of Insurance; and
        (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

        No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments — Coverages A and B.

    b.      This insurance applies to "bodily injury" and "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II — Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II — Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II — Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

\*     \*     \*

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

1410901v6

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    a.    False arrest, detention or imprisonment;

    b.    Malicious prosecution;

    c.    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    d.    Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    e.    Oral or written publication, in any manner, of material that violates a person's right of privacy;

    f.    The use of another's advertising idea in your "advertisement"; or

    g.    Infringing upon another's copyright, trade dress or slogan in your "advertisement".

\*    \*    \*

17. "Property damage" means:

    a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

\*    \*    \*

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II — Who Is An Insured.

56. The Charter Oak Primary Policies and the Travelers Primary Policies provide the following relevant exclusions:

2.      Exclusions

This insurance does not apply to:

a.      Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b.      Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

*      *      *

k.      Damage To Your Product

"Property damage" to "your product" arising out of it or any part of it.

l.      Damage To Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard". This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

23

m. Damage To Impaired Property Or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms. This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

57. The Charter Oak Primary Policies and the Travelers Primary Policies provide as to the terms your products, your completed work, and your work as follows:

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the Injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was

24

created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products completed operations are subject to the General Aggregate Limit.

\* \* \*

21. "Your product":

    a.    Means:

    (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

        (a) You;

        (b) Others trading under your name; or

        (c) A person or organization whose business or assets you have acquired;

   and

    (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    b.    Includes:

    (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    (2) The providing of or failure to provide warnings or instructions.

    c.    Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

    a.    Means:

    (1) Work or operations performed by you or on your behalf; and

    (2) Materials, parts or equipment furnished in connection with such work or operations.

    b.    Includes: (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2) The providing of or failure to provide warnings or instructions.

**The Travelers Excess Policies**

58.     The Travelers Excess Policies contain the following insuring agreement:

SECTION I COVERAGES COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; and COVERAGE B. PERSONAL INJURY AND ADVERTISING INJURY

LIABILITY. 1. INSURING AGREEMENT.

a.      We will pay on behalf of the insured the "ultimate net loss" in excess of the "applicable underlying limit" which the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies. This insurance applies to "bodily injury" or "property damage" only if:

(i)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place anywhere in the world;

(ii)   The "bodily injury" or "property damage" occurs during the policy period;

(iii)  Prior to the policy period, no insured listed under Paragraph 1. of SECTION II - WHO IS AN INSURED and no employee authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.  If such a listed insured or authorized employee knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

This insurance applies to "personal injury" or "advertising injury" caused by an "offense" committed during the policy period, anywhere in the world.

b.      Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

c.      "Property damage" that is loss of use of tangible property that is not physically injured shall be deemed to occur at the time of the "occurrence" that caused it.

d.      The amount we will pay for damages is limited as described in SECTION III - LIMITS OF INSURANCE.  …

26

59.     The Travelers Excess Policies contain the following relevant conditions:

> 9.      MAINTENANCE OF UNDERLYING INSURANCE.
>
> The insurance afforded by each policy in the schedule of "underlying insurance" in the Declarations will be maintained for the full term of this insurance. This provision does not apply to the reduction of the aggregate limit or limits due to payment of judgments or settlements for "bodily injury", "personal injury", "property damage" or "advertising injury". As these policies expire, you will renew them at limits at least equal to the expiring limits of insurance. …
>
> 10.     OTHER INSURANCE.
>
> This insurance is excess over any other valid and collectible insurance whether such other insurance is stated to be primary, contributing, excess, contingent or otherwise. This provision does not apply to a policy bought specifically to apply in excess of this insurance.

60.     The Travelers Excess Policies contain substantially the same exclusions as in the Charter Oak Primary Policies and the Travelers Primary Policies as well as other applicable terms, conditions and limitations.

## COUNT I

61.     Plaintiffs hereby incorporate by reference Paragraphs 1-60 of this First Amended Complaint as if each was fully set forth herein.

62.     Walsh's Amended Judgment and the subsequent Settlement resulted from LB Steel's defective and/or nonconforming work at the FACE Project, which was in breach of LB Steel's contract.

63.     There is no coverage for Walsh's Amended Judgment against LB Steel and the subsequent Settlement under the Policies on one or more of the following grounds:

> A.      Walsh's Amended Judgment against LB Steel was not entered in connection with an "event" or an "accident" or an "occurrence" within the meaning of the Policies.

27

B.     Walsh's Amended Judgment against LB Steel was not entered in connection with any "property damage" caused by an "event" or an "occurrence" within the meaning of the Policies.

C.     Walsh's Amended Judgment against LB Steel and the subsequent Settlement was for purely contractual economic loss and not "property damage" within the meaning of the Policies.

D.     Coverage for Walsh's Amended Judgment against LB Steel and the subsequent Settlement is precluded under the Policies by the "Expected or Intended" exclusion.

E.     Coverage for Walsh's Amended Judgment against LB Steel and the subsequent Settlement is precluded under the Policies by the "Damage To Your Products or Completed Work", "Damage to Your Product", and "Damage to Your Work" exclusions.

F.     Coverage for Walsh's Amended Judgment against LB Steel and the subsequent Settlement is precluded under the Policies by the "Impaired Property" exclusions.

G.     Coverage for Walsh's Amended Judgment against LB Steel and the subsequent Settlement is precluded under the Policies by the exclusions for contractual liability.

H.     Coverage for Walsh's Amended Judgment against LB Steel and the subsequent Settlement is precluded under the Policies because the deficiencies of LB Steel's welds do not constitute "property damage" happening during the policy period of the Policies, and, if otherwise, under

28

the Policies' language all such damage is considered to happen during a single policy period.

I.      Coverage for Walsh's Amended Judgment against LB Steel and the subsequent Settlement is precluded under the Policies due to lack of fortuity, as well as the known loss and/or loss in progress doctrines.

J.      For the same reasons as stated hereinabove, there is no coverage under the St. Paul Policies (Excess Coverage) and the Travelers Excess Policies.

K.      The St. Paul Policies (Excess Coverage) and the Travelers Excess Policies are excess to all other insurance.

L.      Walsh's Amended Judgment against LB Steel and subsequent Settlement may not be covered because the Policies contain other terms, provisions, exclusions, limitations, conditions, and endorsements which may preclude coverage for the Judgment against LB Steel upon Plaintiffs' further investigation of these matters and Plaintiffs reserves their rights to amend their First Amended Complaint to allege additional defenses to coverage.

64.     By reason of the foregoing, there is an actual controversy between Plaintiffs and Defendant Walsh, and this Court is empowered under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 to render a declaratory judgment that there is no coverage for Walsh's Amended Judgment and the subsequent Settlement under primary and excess liability insurance policies issued by Plaintiffs to LB Steel.

## COUNT II

65.     Plaintiffs hereby incorporate by reference Paragraphs 1-64 of this First Amended Complaint as if each was fully set forth herein.

66.     Walsh does not qualify as an additional insured under one or more of the Policies.

67.     There is no coverage for Walsh under the Policies on one or more of the following grounds:

   A.     The City's Third Amended Complaint against Walsh did not allege an "event" or an "accident" or an "occurrence" within the meaning of the Policies.

   B.     The City's Third Amended Complaint against Walsh did not allege any "damages" within the meaning of the Policies.

   C.     The City's Third Amended Complaint against Walsh did not allege any "property damage" caused by an "event" or an "occurrence" within the meaning of the Policies.

   D.     The City's Third Amended Complaint against Walsh was for purely contractual economic loss and not "property damage" within the meaning of the Policies.

   E.     Coverage for Walsh is precluded under the Policies by the "Expected or Intended" exclusion.

   F.     Coverage for Walsh is precluded under the Policies by the "Impaired Property" exclusions.

   G.     Coverage for Walsh is precluded under the Policies by the exclusions for contractual liability.

   H.     Coverage for Walsh is precluded under the Policies because no "property damage" happened during the policy period of the Policies, and, if

1410901v6

otherwise, under the Policies' language all such damage is considered to happen during a single policy period.

I.      Coverage for Walsh is precluded under the Policies due to lack of fortuity, as well as the known loss and/or loss in progress doctrines.

J.      For the same reasons as stated hereinabove, there is no coverage for Walsh under the St. Paul Policies (Excess Coverage) and the Travelers Excess Policies.

K.      The St. Paul Policies (Excess Coverage) and the Travelers Excess Policies are excess to all other insurance.

L.      There may be additional defenses to coverage for Walsh based upon other terms, provisions, exclusions, limitations, conditions, and endorsements in the Policies which may preclude coverage upon Plaintiffs' further investigation of these matters and Plaintiffs reserves their rights to amend their First Amended Complaint to allege additional defenses to coverage.

68.     By reason of the foregoing, there is an actual controversy between Plaintiffs and Defendant Walsh, and this Court is empowered under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 to render a declaratory judgment that there is no coverage for Walsh under primary and excess liability insurance policies issued by Plaintiffs to LB Steel.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, St. Paul Guardian Insurance Company, The Charter Oak Fire Insurance Company, and Travelers Property Casualty Company of America, respectfully request this Court enter judgment declaring:

A.       Plaintiffs do not have a duty or obligation under the Policies to provide coverage for and/or to pay for any portion of the Amended Judgment entered in favor of Defendant Walsh in the Underlying Litigation or the subsequent Settlement;

B.       Plaintiffs do not have any duty or obligation under the Policies to defend Walsh;

C.       Plaintiffs do not have any duty or obligation under the Policies to indemnify Walsh; and

D.       Plaintiffs are entitled to such other and further relief as the Court deems just and proper.

Dated: April 17, 2019

Respectfully submitted,

ST. PAUL GUARDIAN INSURANCE COMPANY, THE CHARTER OAK FIRE INSURANCE COMPANY, and TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

By:      /s/ Linda J. Carwile              
      One of Their Attorneys

Roderick T. Dunne
Linda J. Carwile
Paul T. Parker
**KARBAL, COHEN, ECONOMOU, SILK & DUNNE, LLC**
150 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
Tel:    (312) 431-3700
Fax:    (312) 431-3670
rdunne@karballaw.com
lcarwile@karballaw.com
pparker@karballaw.com

1410901v6

## CERTIFICATE OF SERVICE

I, Linda J. Carwile, an attorney of record in this matter, hereby state that I electronically filed the foregoing, First Amended Complaint for Declaratory Judgment, using the CM/ECF SYSTEM, which will send notification to all attorneys of record on this the 17th day of April, 2019.

/s/ Linda J. Carwile
One of the Attorneys for Plaintiffs

1410901v6