THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ST. PAUL GUARDIAN INSURANCE COMPANY, et al., | ) ) ) |
| *Plaintiffs*, | ) ) No. 15 C 10324 |
| v. | ) ) Judge Virginia M. Kendall |
| WALSH CONSTRUCTION COMPANY, | ) ) ) |
| *Defendant*. | ) |

## MEMORANDUM OPINION AND ORDER

Defendant Walsh Construction Company built a steel canopy for the City of Chicago at O'Hare International Airport, using defective steel parts from its sub-subcontractor LB Steel. After the City discovered the defects and became concerned about the canopy's stability, it sued Walsh and required the construction company to perform expensive testing and repairs. Walsh, in turn, won a multi-million-dollar judgment against LB Steel, which promptly went bankrupt. LB Steel's insurers, Plaintiffs St. Paul Guardian Insurance Company, Travelers Property Casualty Company of America, and the Charter Oak Fire Insurance Company, brought this action seeking a declaratory judgment that its policies do not cover Walsh's losses. The parties cross-move for summary judgment. (Dkts. 157, 172). For the following reasons, the Insurers' motion is granted, and Walsh's is denied.

## BACKGROUND

**A.      The "FACE" Construction Project**

In January 2003, Walsh Construction Company contracted with the City of Chicago as a general contractor for the Façade and Circulation Enhancement (FACE) Project at O'Hare International Airport. (Dkt. 182 ¶ 17). The FACE Project involved building a steel canopy and a

"steel and glass curtain wall system" and updating the terminal vestibules and airport façade. (*Id.* at ¶ 18). Walsh subcontracted with Carlo Steel Corporation for the fabrication, delivery, and installation of the steel and curtain wall. (*Id.* at ¶ 20). The Walsh-Carlo subcontract included a warranty provision through which Carlo "warrant[ed] its work against all deficiencies and defects in materials and/or workmanship." (*Id.* at ¶ 21; Dkt. 158-8 at 6).

Carlo then subcontracted with LB Steel for the manufacture and supply of steel elements. (Dkt. 182 ¶ 22). The Carlo-LB Steel subcontract contained an indemnity provision: "To the furthest extent permitted by law, Subcontractor shall defend, indemnify, and hold harmless Carlo . . . and . . . Walsh . . . as required by this Agreement for bodily injury and property damage that may arise from performance of the Subcontract Work to the extent of the negligence attributed to such acts or omissions by Subcontractor, Subcontractor's subcontractors or anyone employed directly or indirectly by any of them or by anyone whose acts any of them may be liable." (*Id.* at ¶ 23; Dkt. 158-9 at 3). The Carlo-LB Steel subcontract also included a performance bond requirement and a failure-of-performance provision, which allowed Carlo—and Walsh by extension—to correct deficient performance. (Dkt. 182 ¶ 24; Dkt. 148-9 at 1, 3). LB Steel supplied thirty-one steel columns, hammerheads, and box girders supporting the canopy for the FACE Project between December 2003 and March 2004. (Dkt. 182 ¶ 25; Dkt. 189 ¶ 1).

In December 2004, the City found cracks in the welding of the canopy. (Dkt. 182 ¶ 26; Dkt. 158-36 ¶ 5). LB Steel had performed some of the welds. (Dkt. 182 ¶ 26; Dkt. 158-36 ¶ 5). Due to the cracks, Walsh and Carlo stopped paying LB Steel by January 21, 2005. (Dkt. 182 ¶ 27). In February 2005, LB Steel filed a complaint against Walsh seeking $7 million in damages. (*Id.*) In November 2005, the City discovered additional defective welding in one of LB Steel's columns, raising concerns about the canopy's structural integrity and leading the City's engineer to

determine that further investigation was necessary. (*Id.* at ¶ 29; Dkt. 170 ¶¶ 29, 31–32). The City required Walsh to install shoring around the defective column. (Dkt. 170 ¶ 33; Dkt. 189 ¶¶ 5–6). The City also considered, and decided against, dismantling and rebuilding the entire canopy system. (Dkt. 189 ¶¶ 9–11).

In October 2007, third-party testing of steel samples from the canopy resulted in findings that several of LB Steel's welds did not conform with welding code, contained cracks, or were inconsistently hard. (Dkt. 182 ¶¶ 32–33). Indeed, in five out of six LB Steel welds sampled, testing revealed "incorrect weld preparation, incorrect weld execution, and [im]proper quality control." (*Id.* at ¶ 33). On October 26, 2007, the City directed Walsh to design and install further shoring immediately. (*Id.* at ¶ 35). In February 2008, Walsh and the City entered a settlement through which Walsh agreed to conduct necessary repairs of defective steel work at its own expense according to the City's instruction. (*Id.* at ¶ 36). Although the majority of welds were defective, the City required Walsh to correct defects affecting the canopy's stability, including by retrofitting the steel columns. (Dkt. 170 ¶ 44–46). Since the retrofits altered the appearance of the affected terminals, the City also required Walsh to make cosmetic modifications to an additional terminal so that it matched the others. (*Id.* at ¶ 47). The canopy never collapsed. (Dkt. 182 ¶ 38).

**B.   The Insurance Policies**

LB Steel had insurance policies from St. Paul Guardian Insurance Company, Travelers Property Casualty Company of America, and the Charter Oak Fire Insurance Company. (Dkt. 182 ¶¶ 1–4). The policies at issue only apply to "property damage" resulting from an "event" or "occurrence." (*Id.* at ¶¶ 5–6). The St. Paul policies define "property damage" as "physical damage to tangible property of others." (*Id.* at ¶ 5). Similarly, the Travelers and Charter Oak policies define "property damage" as "physical injury to tangible property." (*Id.* at ¶ 7). An "event," under the St.

3

Paul policies, and an "occurrence," according to the Travelers and Charter Oak policies, have the same definition: "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at ¶¶ 5, 8). The St. Paul, Travelers, and Charter Oak policies each contain exclusions for (1) damage to the products or work of the insured, (2) contractual liability, and (3) impaired property. (*Id.* at ¶¶ 11–14). The policies also require that the insured provide notice "as soon possible" or "as soon as practicable" following a potentially covered "event" or "occurrence." (*Id.* at ¶ 10).

C. **The Underlying Litigation**

    1. **The City's Lawsuit Against Walsh**

In April 2007, the City brought a lawsuit in the Illinois circuit court arising out of the defective design and construction of the FACE Project, alleging claims of breach of contract, breach of fiduciary duty, and contractual indemnity. (*Id.* at ¶ 39); *City of Chicago v. Murphy/Jahn, Inc. Architects*, No. 2007 L 003886. The City filed a second amended complaint on November 3, 2008, which brought claims of breach of contract and contractual indemnity against Walsh. (Dkt. 182 ¶¶ 39–42). On January 21, 2010, Walsh tendered its defense against the claims in the second amended complaint to the Insurers as an additional insured. (*Id.* at ¶ 43). The Insurers acknowledged their receipt of Walsh's claim on January 26, 2010 and requested additional materials from Walsh. (Dkt. 170 ¶ 50). The City's third amended complaint, filed May 21, 2010, added allegations to the breach-of-contract claim and brought a false-claims count against Walsh, which did not involve LB Steel. (Dkt. 182 ¶¶ 39, 44–47; Dkt. 170-21). The second and third amended complaints alleged that Walsh "breached its contractual obligations," including by "providing welds containing slag and other irregularities." (Dkt. 182 ¶¶ 40–42, 44–47). The City alleged that its damages "include[d] costs associated with investigation, loss of competitive

4

advantage, removal, repair and/or replacement, additional costs of construction, diminution of value, and costs for consultants and attorneys." (*Id.*)

The Insurers had possession of the second amended complaint by March 9, 2010. (Dkt. 170 ¶ 53). Claim notes from that day stated:

> The lawsuit does allege work defects in the work that LB Steel provided for the project. [T]hey fabricated the steel. [T]o the extent that they did not follow the plans/specs that could give rise to some negligence. [N]othing in the complaint alleges damage, other than a minor mention of cracked welds.

(Dkt. 189 ¶ 30; Dkt. 159 at 10). Although Walsh gave the Insurers a copy of the City's third amended complaint on August 4, 2010, the Insurers did not defend Walsh. (Dkt. 182 ¶ 48). In September 2010, Walsh filed an answer including affirmative defenses and a three-count Counterclaim against the City. (*Id.* at ¶ 49). Around January 2013, Walsh agreed to pay the City $10 million out of the contract balance that the City had been holding to settle the lawsuit. (Dkt. 182 ¶ 50). Walsh settled "because of the likelihood that the City would [have been] successful in recovering damages from Walsh" based on LB Steel's deficient steel work. (*Id.* at ¶ 51; Dkt. 170-22 ¶ 92). On February 21, 2013, the circuit court granted the parties' joint motion to dismiss the case with prejudice pursuant to the settlement. (Dkt. 182 ¶ 52).

**2. Walsh's Lawsuit Against LB Steel**

In the same underlying litigation, Walsh filed a third-party complaint against LB Steel on June 3, 2009 and amended its third-party complaint on September 20, 2010. (*Id.* at ¶ 53). Walsh filed a second amended third-party complaint on March 12, 2013, which alleged counts of breach of contract, professional negligence, and fraud against LB Steel. (*Id.* at ¶¶ 54–55). Walsh's breach-of-contract claim arose out of the Carlo-LB Steel subcontract, which Carlo assigned to Walsh. (*Id.* at ¶¶ 56, 79; Dkt. 170-22 ¶¶ 97–126). For the breach-of-contract claim, Walsh sought $10 million in damages based on its settlement with the City and "over $25,000,000.00 to investigate LB

5

Steel's defective welds and to design and implement a repair procedure to remediate LB Steel['s] defective welds." (Dkt. 182 ¶ 58; Dkt. 170-22 ¶ 94, 109).

In Walsh's professional negligence count, it alleged: "LB Steel breached its professional duty by providing many defective welds as set forth in Count I [for breach of contract] of this Second Amended Third-Party Complaint." (Dkt. 182 ¶ 60). Walsh sought the same damages for its professional negligence claim as for the breach-of-contract claim. (*Id.*) On August 3, 2015, the circuit court granted LB Steel's motion for summary judgment on Walsh's professional negligence claim, agreeing with LB Steel that the *Moorman* doctrine barred recovery in tort since Walsh sought only economic losses. (*Id.* at ¶¶ 61–68).

In its trial brief, Walsh "describe[d] in detail how LB Steel's welds on the structural steel columns it manufactured for the FACE project were not in conformance with the contract requirements." (*Id.* at ¶ 71). Walsh explained further that:

> the process of identifying the extent of the defective welds, performing engineering analyses to determine the structural sufficiency of all of the critical welds, devising an appropriate remediation plan, and performing the necessary repairs, caused Walsh to incur substantial costs. In addition to the costs it incurred, Walsh was forced to absorb much of the costs the City incurred due to LB Steel's defective work on the Project.

(*Id.* at ¶ 72). Seeking $33,175,977 in damages for LB Steel's breach of contract, Walsh explained:

> Walsh's damages are comprised of the following components: (I) $23,175,977 – amount spent by Walsh to repair LB Steel's defective structural steel work, including defective welds, alleged in Walsh's Second Amended Third-Party Complaint ("Complaint"). These costs of repair include costs for investigation, engineering and repair, such as labor, materials, equipment, overhead, subcontractor costs, and profit; and (II) $10,000,000 – amount of the settlement payment made by Walsh to the City to resolve claims asserted by the City against Walsh as a result of LB Steel's defective structural steel work, including defective welds, that breached LB Steel's contractual obligations on the Project.

(*Id.* at ¶ 73).

In closing arguments, Walsh's counsel stated: "As the Court knows, this case is about whether LB Steel breached its obligations in connection with the fabrication of the columns, hammerheads, and box girders that were used for the O'Hare FACE Project at Terminals 2 and 3." (*Id.* at ¶ 78). Walsh's damages, its counsel explained, were "the costs it experienced to investigate and repair defective welds." (*Id.* at ¶ 80). Walsh's counsel concluded: "all we are asking for in this case is to be compensated for the costs of investigation and repair and the reduction of our contract amount that we had to agree with the City to pay their costs." (*Id.* at ¶ 84).

On October 14, 2015, the circuit court ruled that "the contract documents support Walsh's theory of the case," and "Walsh's damages are the costs it incurred to repair the defective welds. The damages are supported by the contract terms, the exhibits, and the credible witnesses' testimony." (*Id.* at ¶¶ 85–86). In total, the court awarded $27.5 million in damages—including $8 million from Walsh's settlement with the City. (*Id.* at ¶ 87). The court noted that Walsh had not met its burden in proving fraud and entered judgment for LB Steel on Walsh's fraud claim. (*Id.* at ¶ 88). After applying credits and setoffs, the net judgment against LB Steel totaled $19,187,304. (*Id.* at ¶ 89). LB Steel filed for bankruptcy four days later. (*Id.* at ¶ 90).

On appeal, the Illinois appellate court reversed the trial court's decision in part with respect to the credits and setoffs and remanded for the circuit court to decide LB Steel's quantum meruit claim. (*Id.* at ¶ 91); *LB Steel, LLC v. Carlo Steel Corp.*, 122 N.E.3d 274 (Ill. App. Ct. 2018). Yet, the appellate court affirmed the circuit court's decision on Walsh's breach-of-contract and fraud claims. (Dkt. 158-36 ¶ 59). Reviewing the circuit court's decision, the appellate court noted:

> [i]mplicit in the trial court's ruling is the determination that the 'defective welds' performed by LB Steel constituted a material breach of the Sub-Subcontract. The evidence established that LB Steel's defective welding caused it to be in material breach of the Sub-Subcontract no later than March 2004, when it delivered the affected support columns, and it remained in material breach when Carlo Steel

7

began withholding payment in December 2004 and when the City discovered defects in LB Steel's welding for the steel support columns it manufactured.

(Dkt. 182 ¶ 92).

### 3. The Bankruptcy Settlement

On December 19, 2018, the presiding court in LB Steel's bankruptcy approved a settlement giving Walsh $3,367,350 in deposited funds and a $24,132,650 general unsecured claim against LB Steel's estate. (Dkt. 182 ¶¶ 93–94). The parties agreed that Walsh could not recover interest, fees, or costs on its claim. (*Id.* at ¶ 94). Walsh withdrew its pending motion for rehearing in the Illinois appellate court, and the circuit court granted LB Steel's motion to dismiss its claims in the underlying litigation "with prejudice, without costs or fees, pursuant to settlement." (*Id.* at ¶ 95).

### D. Procedural History

St. Paul brought a declaratory judgment action against Walsh on November 13, 2015, seeking a ruling that LB Steel's St. Paul policies did not cover the judgment for Walsh against LB Steel. (Dkt. 1). Insurers filed an Amended Complaint on April 17, 2019, adding Plaintiffs Charter Oak and Travelers and seeking a declaratory judgment that (1) there is no coverage for the LB Steel settlement; and (2) that the Insurers had no duty to defend or indemnify Walsh. (Dkt. 60). Walsh filed an answer to the Amended Complaint on June 12, 2019, raising affirmative defenses of estoppel and waiver, and bringing counterclaims for (1) recovery under LB Steel's policies from the Insurers; (2) breach of the Insurers' duty to defend; (3) indemnification; and (4) sanctions under 215 ILCS 5/155. (Dkt. 64). Insurers answered Walsh's Counterclaim on November 1, 2019, (Dkt. 74), and amended the answer on December 6, 2019, which alleges seven affirmative defenses: (1) late notice; (2) no coverage for pre-tender defense costs; (3) failure to mitigate; (4) known loss; (5) failure to obtain consent for settlement; (6) offset; and (7) contribution (Dkt. 79).

8

On October 5, 2022, this case was reassigned following the retirement of the Honorable Charles R. Norgle. (Dkt. 190). Before the Court are the parties' cross-motions for summary judgment on Counts I and II of the Insurers' Amended Complaint and Counts I–IV of Walsh's Counterclaim. (Dkts. 157, 172).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, the Court "construe[s] all facts and inferences in favor of the party against whom the motion under consideration is made." *Markel Ins. Co. v. Rau*, 943 F.3d 1012, 1016 (7th Cir. 2020). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). A genuine issue of material fact exists when there is "sufficient evidence" for a jury to return a verdict in favor of the party opposing summary judgment. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## DISCUSSION

I. **Insurance Coverage (Insurers' and Walsh's Count I)**

In Count I of the Insurers' Amended Complaint, they seek a declaratory judgment that their policies do not cover the LB Steel settlement. (Dkt. 60 ¶¶ 61–64). Count I of Walsh's Counterclaim seeks judgment against the Insurers for the LB Steel settlement under the policies. (Dkt. 64 ¶¶ 73–85).[1] Illinois law controls since Illinois is the place of delivery of the insurance policies and where

---

[1] The Court previously construed Count I of Walsh's Counterclaim as a breach-of-contract claim, rather than a declaratory-judgment claim duplicative of the Insurers' Count I. (Dkt. 73). Although distinct causes of action, the Court discusses these claims together, since one rises and the other falls on the same analysis.

9

the subject of the claim occurred. (Dkt. 161 at 3; Dkt. 176 at 3); *see Supreme Laundry Serv., L.L.C. v. Hartford Cas. Ins. Co.*, 521 F.3d 743, 746 (7th Cir. 2008) (citing *Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 655 N.E.2d 842, 845 (Ill. 1995)). Under Illinois Law, interpreting an insurance policy is a question of law, which the Court may resolve on summary judgment. *Am. Bankers Ins. Co. of Fla. v. Shockley*, 3 F.4th 322, 327 (7th Cir. 2021); *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 491 (Ill. 2001).

In construing an insurance policy, the Court aims "to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Sproull v. State Farm Fire & Cas. Co.*, 184 N.E.3d 203, 209 (Ill. 2021). Undefined terms should receive "their plain, ordinary, and popular meaning," as a reasonable person would understand them. *Id.* Policy language that "is susceptible to more than one reasonable meaning" is "ambiguous and will be construed strictly against the insurer." *Id.* (citing *Eljer*, 757 N.E.2d at 293). Yet, "creative possibilities" are not the same as reasonable constructions: the Court "will not strain to find ambiguity in an insurance policy where none exists." *Hess v. Est. of Klamm*, 161 N.E.3d 183, 188 (Ill. 2020) (quoting *Bruder v. Country Mut. Ins. Co.*, 620 N.E.2d 355, 362 (Ill. 1993), and *Eljer*, 757 N.E.2d at 293).

An insured bears the initial burden of showing coverage under a policy. *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 319 (7th Cir. 2021) (citing *Addison Ins. Co v. Fay*, 905 N.E.2d 747, 752 (Ill. 2009)). If that burden is met, "the burden shifts to the insurer to show that an exclusion applies" and "that its applicability is 'clear and free from doubt.'" *Id.* at 319–20 (citing *Addison*, 905 N.E.2d at 752, and quoting *4220 Kildare, LLC v. Regent Ins. Co.*, 171 N.E.3d 957, 966 (Ill. App. Ct. 2020)).

"[A]n insurer has a duty to indemnify 'when the insured becomes legally obligated to pay damages in the underlying action that gives rise to a claim under the policy.'" *Allied Prop. & Cas.*

10

*Ins. Co. v. Metro N. Condo. Ass'n*, 850 F.3d 844, 847 (7th Cir. 2017) (quoting *Eljer*, 757 N.E.2d at 293). If the insured incurs liability due to the underlying claim, the insurer only has a duty to indemnify if "the insured's activity and the resulting loss or damage *actually* fall within the CGL policy's coverage." *Id.* (quoting *Eljer*, 757 N.E.2d at 293). Where an insured settles a claim, the insurer is liable "only if the legally recoverable damages stemming from that claim are covered by the policy." *Id.* Coverage under standard CGL policies does not extend to breach-of-contract claims. *Allied*, 850 F.3d at 848 n.3; *Viking Constr. Mgmt., Inc. v. Liberty Mut. Ins. Co.*, 831 N.E.2d 1, 8–9 (Ill. App. Ct. 2005).

The policies here cover only "bodily injury" or "property damage" resulting from an "event" or "occurrence." (Dkt. 182 ¶¶ 5–6). "Property damage" means "physical damage to tangible property of others" under the St. Paul policies and "physical injury to tangible property" under the Travelers and Charter Oak policies. (*Id.* at ¶¶ 5, 7). The "plain and ordinary meaning [of] 'physical injury' unambiguously connotes damage to tangible property causing an alteration in appearance, shape, color or in other material dimension." *Eljer*, 757 N.E.2d at 502; *accord Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 316 (7th Cir. 2020). Thus, "when an insured causes damages to things other than its own work or product," the resulting costs are "property damage." *Federated*, 983 F.3d at 317 (quoting *Travelers Ins. Cos. v. Penda Corp.*, 974 F.2d 823, 832 (7th Cir. 1992)); *see also Wausau Underwriters Ins. v. United Plastics Grp.*, 512 F.3d 953, 956 (7th Cir. 2008). Yet, property damage "does not include intangible damage to property, such as economic loss." *Eljer*, 757 N.E.2d at 502. And the "costs associated with repairing or replacing the insured's defective work and products . . . are purely economic losses." *Federated*, 983 F.3d at 317 (quoting *Eljer*, 757 N.E.2d at 503). Specifically, damages from "a

11

product's inferior quality or its failure to perform for the general purposes for which it was manufactured and sold" are economic losses. *Eljer*, 757 N.E.2d at 502.

Walsh's costs in repairing and replacing LB Steel's defective steel parts constituted "purely economic losses"—not property damage. *See Federated*, 983 F.3d at 317. Indeed, the record precludes Walsh from demonstrating "physical injury" to any property other than LB Steel's defective parts. And the policies expressly exclude coverage for any damage to LB Steel's work or products. (Dkt. 182 ¶ 11).

Walsh argues that the canopy built of LB Steel's defective steel parts "underwent detrimental physical changes" and that Walsh's costs in retrofitting the canopy to prevent its collapse did not constitute replacement or repair. (Dkt. 178 at 5, 8). Walsh looks for support in *Fireman's Fund Ins. Co. v. Amstek Metal, LLC*, 2008 WL 4066096 (N.D. Ill. Nov. 14, 2021). In *Amstek*, the insured sold defective steel wire to a spring maker who assembled the wire into spring packs. *Id.* at *2. The defective wire "caused the springs within the spring assembly packs to break," forcing the spring maker "to discard broken spring packs, manufacture new ones, and incur related expenses." *Id.* at *2–3. The court held that the insurer had a duty to defend—a broader standard requiring the insured to show *potential* coverage—because the insured's defective wire may have caused damage to the product into which it was incorporated. *Id.* at *9–10. Importantly, repairing the broken spring packs was "not physically possible." *Id.* at *8. Minding the general rule that "a CGL policy does not cover a general contractor's claim for breach of contract in construction cases," the court noted that property damage occurs "if an insured's defective product has been integrated into a larger mechanism, and that defect results in damage to the completed product." *Id.* at *9 (quoting *Continental X-Ray Corp. v. Home Indem. Co.*, 1997 WL 102537, at *4 (N.D. Ill. Mar. 5, 1997)).

12

Unlike in *Amstek*, Walsh had no need to discard the canopy system incorporating LB Steel's defective steel. *Id.* at *8. Indeed, the City decided against dismantling and rebuilding the canopy. (Dkt. 189 ¶¶ 9–11). Contrast *Amstek*, where repair was impossible. Walsh repaired the defects, including by retrofitting the steel columns, and prevented the canopy from collapsing. (Dkt. 170 ¶¶ 33, 44–46; Dkt. 182 ¶¶ 35–36, 38). Walsh therefore avoided any damage to another's property. *See Wausau*, 512 F.3d at 956. Certainly, the concerns about the canopy's structural integrity reflected a risk that property damage might have occurred without intervention. But if that were enough, insurance policies would be "triggered not by the actual product failure, but instead by the potential for the product's failure in the future"—an "absurd result." *Eljer*, 757 N.E.2d at 502. Without evidence of property damage, Walsh cannot prevail by describing product defects as a "failure" and repairs as "retrofitting." (*See* Dkt. 178 at 8–9).

Further, Walsh's efforts to recharacterize its breach-of-contract claim in the underlying litigation are unconvincing. "Although the precise labeling of the claim against the insured is not dispositive when determining coverage, coverage must still be consistent with some viable theory of recovery before a duty to indemnify can arise." *Allied*, 850 F.3d at 848. Walsh's breach-of-contract claim in its third-party complaint against LB Steel sounded *only* in contract. (Dkt. 182 ¶¶ 56–59). And the circuit court granted LB Steel's motion for summary judgment on Walsh's professional negligence claim because Walsh sought purely economic losses—rather than damages for physical injury to property. (*Id.* at ¶¶ 61–68).

The record demonstrates that Walsh's claim was not only labeled breach of contract: the claim was inconsistent with any "viable theory of recovery" that could trigger coverage. *See Allied*, 850 F.3d at 848. Walsh's trial brief argued that LB Steel's defective welds did not conform with the contract requirements and sought damages based on the resulting costs of testing and repairs.

13

(*Id.* at ¶¶ 71–73). Walsh argued in closing that the case was "about whether LB Steel breached its obligations," and Walsh's damages were the costs of investigating and repairing defective welds. (*Id.* at ¶¶ 78, 80, 84). The circuit court ruled for Walsh on its contract theory and awarded as damages "the costs it incurred to repair the defective welds." (*Id.* at ¶¶ 85–86). The appellate court affirmed the circuit court's decision on Walsh's contract claim, (Dkt. 158-36 ¶ 59), explaining that the decision implied that LB Steel had materially breached its contract with Carlo. (Dkt. 182 ¶ 92).

Walsh points to excerpts of trial testimony to suggest that the breach-of-contract claim in the underlying litigation was based on physical damage to the canopy system. (Dkt. 178 at 13–14 (citing Dkt. 189 ¶¶ 5–6, 8–11)). Walsh cites *One Beacon Am. Ins. Co. v. City of Zion*, which analyzed an insurer's duty to defend, and stated that courts must "look past the labels attached to the state court claims and focus on whether the factual allegations as a whole trigger coverage, and if any exclusions apply." 119 F. Supp. 3d 821, 838 (N.D. Ill. 2015). But the record shows no more than that the City required Walsh to prevent damage to the canopy system through testing and repairs. (Dkt. 189 ¶¶ 5–6, 8–11). The City's concerns about the canopy's stability suggest only that LB Steel's products failed to perform adequately. *See Eljer*, 757 N.E.2d at 502.

In sum, the undisputed facts make clear that Walsh's claim in the underlying litigation was not for "property damage." Accordingly, there is no coverage under the policies.[2] Summary judgment for the Insurers is appropriate as to Count I of the Insurers' Amended Complaint and Count I of Walsh's Counterclaim. Next, the Court considers whether potential coverage triggered the Insurers' duty to defend.

---

[2] The Court need not reach the Insurers' further arguments against coverage—including that Walsh is judicially estopped from asserting that it suffered property damage, that there was no "event" or "occurrence" triggering coverage, and that the policies' exclusions apply—or their seven affirmative defenses.

14

**II.     Duty to Defend or Indemnify (Insurers' Count II; Walsh's Counts II–III)**

In Count II of the Amended Complaint, the Insurers seek declaratory judgment that they had no duty to defend or indemnify Walsh against the City's lawsuit. (Dkt. 60 ¶¶ 65–68). Counts II and III of Walsh's Counterclaim allege that the Insurers had a duty to defend or indemnify. (Dkt. 64 ¶¶ 86–97).

An insurer has a duty to defend if the allegations in the underlying complaint "fall within, or potentially within, the policy's coverage." *Lexington Ins. Co. v. Chi. Flameproof & Wood Specialties Corp.*, 950 F.3d 976, 980 (7th Cir. 2020); *accord Pekin Ins. Co. v. Wilson*, 930 N.E.2d 1011, 1017 (Ill. 2010). The insurer has no duty to defend if the underlying complaint's allegations demonstrate that the plaintiff could not have "prove[n] the insured liable, under any theory supported by the complaint, without also proving facts that show the loss falls outside of the insurance policy." *Farmers Auto. Ins. Ass'n v. Danner*, 967 N.E.2d 836, 842 (Ill. App. Ct. 2012) (quoting *Am. Econ. Ins. Co. v. Holabird & Root*, 886 N.E.2d 1166 (Ill. App. Ct. 2008)). Yet, "little weight is given to the legal label under which a count is brought; rather, the determination regarding whether there is a duty to defend focuses on the conduct alleged." *Chi. Flameproof*, 950 F.3d at 980.

The City's claims against Walsh in its second and third amended complaints sounded in contract. (Dkt. 182 ¶¶ 39–42, 44–47; Dkt. 170-21 ¶¶ 198–229). The second and third amended complaints alleged that Walsh "breached its contractual obligations" by "providing welds containing slag and other irregularities." (Dkt. 182 ¶¶ 40–42, 44–47). The City's alleged damages "include[d] costs associated with investigation, loss of competitive advantage, removal, repair and/or replacement, additional costs of construction, diminution of value, and costs for consultants and attorneys." (*Id.*) None of the complaints' allegations suggest any potential "property damage"

15

resulting from an "event" or "occurrence." Further, the complaints sought only economic losses as damages, which if proven, would fall outside of the policies. *See Danner*, 967 N.E.2d at 842.

Walsh bases its argument for potential coverage on "the evidence presented at trial," the judgment against LB Steel, and the "Insurers' claim notes and admissions." (Dkt. 178 at 28–29). Of course, the labels of the claims should receive "little weight." *See Chi. Flameproof*, 950 F.3d at 980. Yet, Walsh asks the Court to ignore the underlying complaint's allegations altogether. This is not the test. Of course, a "court may, under certain circumstances, look beyond the underlying complaint in order to determine an insurer's duty to defend." 930 N.E.2d at 1019. "One such circumstance is where the insurer possesses knowledge of true but unpleaded facts that, when taken together with the allegations in the complaint, indicate" potential coverage. *Pekin Ins. Co. v. AAA-1 Masonry & Tuckpointing, Inc.*, 81 N.E.3d 1040, 1045–46 (Ill App. Ct. 2017) (finding that the allegations in the underlying complaint, "when read in conjunction with [the insurer's] claim note, . . . create[d] the possibility" of liability for negligence).

Walsh leans heavily on the Insurers' claim note that "the lawsuit does allege work defects in the work that LB Steel provided for the project," and that LB Steel's possible failure to "follow the plans/specs . . . could give rise to some negligence." (Dkt. 178 at 30; Dkt. 159 at 10). Yet, Walsh omits the language that follows: "nothing in the complaint alleges damage, other than a minor mention of cracked welds." (Dkt. 159 at 10). The claim note does not suggest that the Insurers had "knowledge of true but unpleaded facts" suggesting possible physical injury to property other than LB Steel's. *See AAA-1 Masonry*, 81 N.E.3d at 1045–46. Considering the claim note "in conjunction with" the allegations in the complaint—none of which suggest any possibility of property damage—Walsh fails to indicate potential coverage. *See id.* Moreover, the evidence

16

presented at the trial and Walsh's judgment against LB Steel do not move the needle in showing that the allegations in the City's underlying complaint suggested possible property damage.

The City's claims against Walsh did not implicate potential coverage under the policies.[3] Without potential coverage, the Insurers had no duty to defend or indemnify Walsh. Accordingly, summary judgment for the Insurers is appropriate as to Count II of the Insurers' Amended Complaint and Counts II and III of Walsh's Counterclaim.

### III. Sanctions Under ILCS Section 155 (Counterclaim Count IV)

Count IV of Walsh's Counterclaim seeks sanctions under 215 ILCS 5/155. (Dkt. 64 ¶¶ 98–105). Section 155 "allows an insured to recover fees when the insurer's denial of coverage or delay in payment is 'vexatious and unreasonable.'" *TKK USA, Inc. v. Safety Nat'l Cas. Corp.*, 727 F.3d 782, 793 (7th Cir. 2013) (citing 215 ILCS 5/155). "It is neither vexatious nor unreasonable to litigate a 'bona fide dispute concerning the scope and application of insurance coverage,' let alone to deny coverage based on a position that prevails." *PQ Corp. v. Lexington Ins. Co.*, 860 F.3d 1026, 1038 (7th Cir. 2017) (quoting *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000)). Since the Insurers here litigated a bona fide dispute, and won, sanctions under Section 155 are inappropriate. Accordingly, the Court grants summary judgment for the Insurers on Count IV of Walsh's Counterclaim.

---

[3] The Court need not discuss in detail the Insurers' late-notice defense to coverage or Walsh's argument that the Insurers are estopped from raising the late-notice defense due to a breach of their duty to defend. Since the Insurers had no duty to defend, estoppel does not apply. *Emps. Ins. of Wausau v. Ehlco Liquidating Tr.*, 708 N.E.2d 1122, 1135 (Ill. 1999) ("Application of the estoppel doctrine is not appropriate if the insurer had no duty to defend, or if the insurer's duty to defend was not properly triggered."); accord *Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 933 F.3d 806, 814 (7th Cir. 2019).

## **CONCLUSION**

For the reasons above, Insurers' motion for summary judgment is granted as to all counts, (Dkt. 172), and Walsh's motion is denied. (Dkts. 157).

_____
Virginia M. Kendall
United States District Judge

Date: March 6, 2023